UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/14/08

------------------------------------------------------x

UNITED STATES OF AMERICA,          :
                                   :
            Plaintiff,             :
                                   :
    v.                             :
                                   :
INTERNATIONAL BROTHERHOOD OF       :
TEAMSTERS, et al.,                 :
                                   :
            Defendants.            :
                                   :
------------------------------------------------------x
APPLICATION No. 128                :
Re: FRANCIS J. GILLEN              :
------------------------------------------------------x

88 Civ. 4486 (LAP)

MEMORANDUM AND ORDER

LORETTA A. PRESKA, United States District Judge:

Application 128 of the Independent Review Board ("IRB") of the International

Brotherhood of Teamsters ("IBT") concerns disciplinary action taken against Francis J.

Gillen ("Gillen"), a member of Local 500 in Philadelphia and an IBT International Vice

President. Based on the recommendation of the IRB, Gillen was charged with failing to

cooperate with the IRB by intentionally giving false testimony during an IRB sworn

examination. The charge was upheld by the IBT after a trial before a hearing panel and

adoption by the General Executive Board ("GEB"). Following submission of objections

by Gillen, the IRB found that the IBT's decision upholding the charge against Gillen was

"not inadequate."

For the reasons set forth herein, Application 128 is granted, and the IRB's "not

inadequate" finding with regard to the charge against Gillen is upheld.

## Background

### A. Proceedings Regarding the Charge Against Gillen

On April 26, 2007, the IRB referred to the IBT its charge that Gillen had intentionally given false testimony during a February 1, 2007 IRB sworn examination in violation of Article II, Section 2(a), and Article XIX, Sections 7(b)(1)-(2) and 14(i) of the IBT Constitution. Specifically, Gillen was charged with giving false testimony regarding his knowing association with a barred member, Thomas Ryan, who had been permanently barred from the IBT on February 18, 1999. IBT General President James P. Hoffa filed the IRB-recommended charge against Gillen and appointed a hearing panel of three GEB members to hear the charge against Gillen, all of whom were IBT International Vice Presidents.

By letter dated May 24, 2007, IBT President Hoffa notified Gillen that a hearing on the charges was scheduled for July 11, 2007. The appointed IBT panel conducted a hearing on July 11, 2007, during which testimony was heard from Gillen, who was represented by counsel, Gillen's wife, Ginny Gillen, and four other witnesses on Gillen's behalf.

By letter dated August 3, 2007, the IBT notified Gillen that the GEB had adopted the Report and Recommendation of the hearing panel (1) holding that Gillen had intentionally given false testimony during his February 1, 2007 sworn examination, and (2) recommending that Gillen be suspended from the IBT membership for a period of three years and that he be barred from seeking or holding IBT office or employment for a period of five years (the "IBT Decision").

Gillen submitted his objections to the IBT Decision to the IRB on August 31, 2007, asserting that (i) the proceedings before the hearing panel violated the IBT Constitution and that he had theretofore been denied a full and fair hearing; (ii) the penalty imposed was excessive; and (iii) the evidence was insufficient to support the charge. By letter dated September 11, 2007, the IRB advised Gillen of its determination that the IBT Decision was "not inadequate."

B. Application 128

On September 25, 2007, the IRB submitted Application 128 to this Court seeking a ruling upholding its September 11, 2007 finding that the IBT Decision was "not inadequate."

The Consent Decree provides that the IRB shall monitor disciplinary actions taken by any IBT entity on IRB-recommended charges to determine whether the charges were "pursued and decided" by that IBT entity "in a lawful, responsible, or timely manner" and whether the resolution of those charges is "inadequate under the circumstances." Consent Decree ¶ I(7).

Although the Consent Decree contains no express procedure by which a union member disciplined by an IBT entity on IRB-recommended charges may appeal such a "not inadequate" determination to this Court, the IRB has followed a practice of facilitating judicial review of its "not inadequate" determinations when a charged party demonstrates his intention to seek review of a "not inadequate" finding. See Sombrotto v. IBT, 01 Civ. 9285 (LAP), 2003 WL 252156, at *4 (S.D.N.Y. Feb. 3, 2003) ("This Court may also review IRB determinations that union discipline is 'not adequate' when requested by the IRB."); see also United States v. Boggia, 167 F.3d 113, 120 (2d Cir.

1999) (upholding district court's affirmance of IRB "not inadequate" determination).

Accordingly, the IRB submitted Application 128, by which the IRB requests that the

Court adopt the IRB's determination that the IBT handling of the charge against Gillen

was "not inadequate."

For the reasons set forth below, the IRB's application is granted.

## Discussion

### I. Standard of Review

The standards governing review of IRB disciplinary decisions are well

established. This Court reviews determinations made by the IRB under an "extremely

deferential standard of review." United States v. IBT ("Carey & Hamilton"), 247 F.3d

370, 379 (2d Cir. 2001); United States v. IBT ("Simpson"), 120 F.3d 341, 346 (2d Cir.

1997); United States v. IBT ("DiGirlamo"), 19 F.3d 816, 819-20 (2d Cir. 1994), cert.

denied, 513 U.S. 873 (1994). The IRB Rules, which were approved by this Court and the

Court of Appeals, provide for review of decisions of the IRB under "the standard of

review applicable to review of final federal agency action under Administrative

Procedrue Act." IRB Rules ¶ O. See United States v. IBT ("IRB Rules"), 803 F. Supp.

761, 805-06 (S.D.N.Y. 1992), aff'd as modified, 998 F.2d 1101 (2d cir. 1993). Under

this extremely deferential standard, an IRB decision may be set aside only if it is

"arbitrarily, capricious, an abuse of discretion, or otherwise not in accordance with law."

Carey & Hamilton, 247 F.3d at 380 (quoting 5 U.S.C. § 706(2)(A)).

### II. The IRB's Determination of Liability

Applying these standards, the IRB acted well within its discretion when it upheld

the IBT Decision finding that Gillen intentionally gave false testimony in an IRB sworn

4

examination and that Gillen should be suspended from IBT membership for three years
and barred from holding any IBT office or employment for five years.

A.    The IRB's Decision Upholding the IBT's Finding that Gillen
      Intentionally Gave False Testimony Was Not Arbitrary and Capricious

Section 14(i) of Article XIX of the IBT Constitution provides that "[a]ll officers,

members, employees, and representatives of the International Union and its affiliated

bodies shall cooperate fully with the Independent Review Board in the course of any

investigation or proceeding undertaken by it." Section 14(i) further states that an

"[u]nreasonable failure to cooperate with the Review Board shall be deemed to be

conduct which brings reproach upon the Union, and which is thereby within the Review

Board's investigatory and decision authority."

Gillen was charged with bringing reproach upon the IBT by intentionally giving

false testimony during a February 1, 2007 IRB sworn examination with regard to his

association with a barred member, Thomas Ryan ("Ryan").[1]

---

[1] Paragraph E(10) of the Consent Decree forbids IBT officers, representatives, employees,
and members from knowingly associating with a member or associate of organized crime
or "any person otherwise enjoined from participating in union affairs." Consent Decree
¶ E(10); see also United States v. IBT ("Carey and Hamilton Discipline"), 22 F. Supp. 2d
135, 144 (S.D.N.Y. 1998), aff'd, 247 F.3d 370, 390 (2d Cir. 2001). "Prohibited knowing
association . . . is established when contact is purposeful and not incidental or fleeting."
United States v. IBT, 824 F. Supp. 410, 414 (S.D.N.Y. 1993), aff'd DiGirlamo, 19 F.3d
816. "Purposeful contacts are prohibited even if no illegal purpose is demonstrated[, and
p]urposeful contact may occur in either a business or social setting." Id. (citations
omitted). Knowing association may be inferred from "duration and quality" of the
association. United States v. IBT ("Senese & Talerico"), 745 F. Supp. 908, 918
(S.D.N.Y. 1990), aff'd, 941 F.2d 1292 (2d Cir. 1991); United States v. IBT ("Cozza"),
764 F. Supp. 797, 812 (S.D.N.Y. 1991).
(Continued on next page)

There is no dispute in the record that (1) Ryan was barred from IBT membership on February 18, 1999; (2) Gillen had numerous contacts with Ryan in 2000 and 2001; and (3) despite these contacts and his knowledge of Ryan's bar, Gillen testified under oath on February 1, 2007, that he had not had contact with Ryan in violation of the permanent bar.

First, the evidence showed that Ryan, a member of Local 107 in Philadelphia, Pennsylvania, was permanently barred from the IBT on February 18, 1999, for violating the terms of a previously-issued five-year suspension from the union. See IRB Ex. A, at 5-6; IRB Exs. 19-20, 21, 24. Gillen was aware of Ryan's bar because it had been reported in the July/August 1999 issue of the Teamster Magazine (IRB Ex. 1, at 110-11; IRB Ex. D, at 171; IRB Ex. 22), and knew that as a result of the permanent bar, he was prohibited from associating with Ryan (IRB Ex. D, at 171).

Second, there is no dispute in the record that Gillen had numerous contacts with Ryan in 2000 and 2001. Gillen admitted before the IBT hearing panel that he had spoken to Ryan "maybe four to five times," and possibly on more occasions, after Ryan's permanent bar in 1999. See IRB Ex. D, at 171-72, 221. Documentary evidence, which

(Continued from previous page)

For purposes of the Consent Decree's associational ban, a person is considered to have been "enjoined from participating in union affairs" is he is either subject to a court order enjoining his participation in the affairs of the IBT or another union, see United States v. Mason Tenders District Council, 205 F. Supp. 2d 183, 190 (S.D.N.Y. 2002), or if he was permanently barred from membership in the IBT "pursuant to the disciplinary process established in the [C]onsent [D]ecree." United States v. IBT ("Sombrotto"), 266 F.3d 45, 51 (2d Cir. 2001). The effect of the Consent Decree's associational ban on IBT members is clear: It prohibits IBT members from knowingly associating with any organized crime figure or any person who has been "enjoined from participating in union affairs." Because the ban applies by its terms to current IBT members, the IRB and the Union may enforce the ban against current IBT members who knowingly associate with a prohibited person by bringing disciplinary charges for violation of the IBT Constitution.

included a sworn affidavit submitted by Ryan to this court in another proceeding in 2006, see IRB Ex. 23, and telephone records reflecting calls between Gillen's Local 500 cell phone and home phones and Ryan's two home phone numbers, see IRB Exs. 27-39, confirmed Gillen's contacts with Ryan after February 1999. Indeed, the telephone records reflected as many as ninety-five calls between Gillen's and Ryan's numbers. Id.

Despite these undisputed facts, Gillen testified during a February 1, 2007 IRB sworn examination that he had no contact with Ryan after the permanent bar was issued. See IRB Ex. 1, at 111. Gillen's answers regarding his lack of contact with Ryan were unqualified.

Q. Have you had any contact with Mr. Ryan after he has been barred?

A. No, ma'am.

Q. Prior to Mr. Ryan being barred, did you have any meals with him?

A. No, ma'am.

Q. Did you ever socialize with Mr. Ryan?

A. No, ma'am.

Q. Before he was barred?

A. No, ma'am.

Q. And have you had any contacts with Mr. Ryan after he has been barred?

A. No, ma'am.

Q. Has Mr. Ryan ever called you after he has been barred?

A. No, ma'am.

Q. Have you ever called Mr. Ryan after he has been barred?

A. No, ma'am.

7

See IRB Ex. 1, at 111-12. Later in his sworn examination, Gillen was asked more specific questions regarding contacts with Ryan, to which he responded that he had not had a conversation with Ryan regarding Ryan's reinstatement to the IBT, had not met in person with Ryan, and had no contact with Ryan through a third party. See IRB Ex. 1, at 113-14, 116-17, 211. Contrary to Gillen's characterization at oral argument, the questions were specific and detailed. Accordingly, the record reflects that Gillen gave false testimony on February 1, 2007, regarding his contacts with barred member Ryan.

Moreover, the IRB reasonably adopted the IBT Decision to the extent that it rejected Gillen's purported explanations for his false testimony. Gillen argues in his objections to Application 128, as he testified before the hearing panel and argued to the IRB in his objections to the IBT Decision, that he "fail[ed] to recollect certain events" during his IRB sworn examination due to a stroke he suffered in January 2007. See IRB Ex. D, at 190-91; IRB Ex. G at 19-20; Gillen Objections, at 4-5, 24.[2] However, the transcript of the very same February 1, 2007 examination – which reflects Gillen's detailed recollection of other events, some of which occurred many years prior to the examination – undermines that claim. See, e.g., IRB Ex. 1, at 9-14 (testimony regarding appointment to trustee and leadership positions in Local 107 and Local 500 from 1994 to 2005); IRB Ex. D, at 209-213 (cross-examination before panel hearing regarding recollection of other events). Indeed, during his IRB sworn testimony, Gillen specifically recalled seeing Ryan in Laurel Springs, Pennsylvania, and testified that Ryan did not

---

[2] At no time in any of the proceedings did Gillen submit any medical evidence supporting the effect of the stroke on his memory.

8

greet him on that occasion. See IRB Ex. 1, at 113-14.[3]  Also, although Gillen claims that many of the memories of his telephone calls with Ryan came back to him after he learned of the IRB-recommended charge against him, he never so notified the IRB about his supposed memory loss (Ex. D at 193-94, 213; Ex. E at 12) and never made any effort to correct the February 1, 2007 transcript (Ex. D at 213-14).

Furthermore, Gillen's contradictory testimony before the IBT hearing panel undermined his contention that he merely failed to recall his contacts with Ryan. When asked why he had responded "No" to questions during his February 1, 2007 examination regarding his contacts with Ryan, Gillen testified that he thought the contacts were justified because he was serving as Chairman of the Welfare Fund and Ryan was seeking information regarding health benefits. See Ex. D, at 192-93 ("To be honest with you, probably because the phone calls were so long ago, I wasn't thinking straight, you know, and if I was speaking to him, the only reason I was speaking to him was under health and welfare."). Gillen subsequently acknowledged in his testimony that he knew of no "health and welfare" exception that permitted contacts with barred members. See id., at 207-08. Thus, the record plainly reflects that Gillen gave false testimony about what he says were innocent contacts with Ryan, which – if he had believed them to be innocent – would have presented no reason for denial.[4]

---

[3] As the IBT stated, "the transcript of his February 1, 2007 sworn testimony reflects that Brother Gillen provided vivid details regarding his personal history and background and regarding a number of past events, including a contentious trusteeship in Local 115 and an occasion in 2000 when he personally observed Ryan working for a company called Tri-state Health and Welfare." (Ex. E at 12)

[4] As the IBT found:
"[n]ot only is the argument that Gillen spoke to Ryan solely in his capacity as a
(Continued on next page)

9

Finally, during his testimony before the IBT hearing panel, Gillen continued to minimize the extent of his contacts with Ryan, thus providing further support for the IRB's affirmance of the IBT's Decision that Gillen testified falsely. Gillen testified on direct examination before the hearing panel that he had contact with Ryan "four or five times." See IRB Ex. D, at 171-72. After Gillen was confronted with the telephone records for his home and cell phones, which included numerous calls between the parties' numbers, he conceded that he may have had more than five to ten conversations with Ryan. Id., at 220-221. Gillen's reluctance to admit such contacts, even after the IRB charge was referred to the IBT, sheds doubt on his alleged lack of recollection during his February 1, 2007 IRB examination.

For these reasons, it was not arbitrary or capricious for the IRB to uphold the IBT's finding that Gillen gave false testimony regarding his contacts with Ryan during his February 1, 2007 IRB examination.

### B. Gillen Failed to Establish Any Procedural Defect in His Hearing

In his submission to the Court, Gillen argued that the proceedings against him were defective because 1) the hearing panel chair was allegedly under investigation by the IBT and therefore was not impartial; 2) the entire GEB should have conducted the evidentiary hearing on the charge against him; 3) the General President and General Counsel interpreted the IBT Constitution without authority; 4) the three GEB members

---

(Continued from previous page)

Plan fiduciary something of a stretch, we do not in any event believe that the substance of or reasons for the conversations impair the materiality of the false testimony about Brother Gillen's contacts with Ryan. The simple fact of the matter is that Brother Gillen was asked about whether he had any contacts with Ryan and he flatly denied having any. That there might have been a good reason for the contacts does not explain his false responses."

10

who conducted the evidentiary hearing should have been disqualified from participating

in the GEB vote because they had been transformed into "involved" members by virtue

of conducting the hearing, and 5) the IBT General President should have been

disqualified from voting because he filed the IRB-recommended charge against Gillen.

(Br. at 10-15, 18-21).[5] For the reasons set out below, each of Gillen's arguments is

without merit.

> Pursuant to the LMRDA, 29 U.S.C. § 411(a)(5),

> "No member of any labor organization may be fined, suspended,
> expelled, or otherwise disciplined except for nonpayment of dues
> by such organization or by any officer thereof unless such member
> has been (a) served with written specific charges; (b) given a
> reasonable time to prepare a defense; (c) afforded a full and fair
> hearing."

Section 101(5)(C) of the LMRDA "does not require that union disciplinary hearings

incorporate the specific protections associated with judicial proceedings, including the

right to be represented by counsel and the technical rules of pleading, procedure, and

evidence." Frye v. United Steelworkers of Am., 767 F.2d 1216, 1224 (7th Cir.), cert.

denied, 474 U.S. 1007 (1985), cited in United States v. IBT ("Kikes"), 2007 WL 2319129

(S.D.N.Y. Aug. 9, 2007). A violation of a procedural provision of a union constitution is

only actionable if the party was deprived of a full and fair hearing as a result. See Carey

and Hamilton, 247 F.3d at 385-86; see also Yager v. Carey, 159 F.3d 638 (D.C. Cir.

1998), aff'g 910 F. Supp. 704, 713 (D.D.C. 1995) ("A court considering a claim for relief

---

[5] Gillen's Objections also purport to assert a due process claim under the Fifth
Amendment. See Gillen Objections, at 10. However, as the IBT's Decision and the
IRB's findings affirming the decision do not constitute government action, the claim is
without merit. See, e.g., Unitd States v. IBT ("Senese and Talerico"), 941 F.2d 1292,
1295-96 (2d Cir. 1991) (rejecting Fifth Amendment challenge to IBT-imposed discipline
for lack of government action); United States v. IBT ("Simpson"), 931 F. Supp. 1074,
1107-08 (S.D.N.Y. 1996), aff'd, 120 F.3d 341 (2d Cir. 1997).

under the LMRDA because a party alleges that an internal union disciplinary hearing violated the union's constitution must conduct a two-step inquiry: (1) the court must find that the hearing violated the constitution; and (2) it must find that the violation deprived plaintiffs of a fair trial within the meaning of the LMRDA.") . Accordingly, "courts should intervene in union disciplinary actions under section 101(a)(5) only if there has been a breach of fundamental fairness." See Kikes, 2007 WL 2319129, at *4; Carey and Hamilton Discipline, 22 F. Supp. 2d at 143.

### 1. Gillen's Claim that the IBT Hearing Panel Chair was Biased is Without Merit

Gillen argued that he "was denied his due process right to trial by an impartial tribunal under the IBT Constitution, [and] the LMRDA . . . ." (Br. at 10)  Gillen claimed that Haynes, the hearing panel chair, was biased against Gillen because at the time of the hearing, Haynes was reportedly under investigation for accepting payments from two health insurance plans that performed work for his Local.  (Br. at 10-12, 20)[6]  At oral argument before the Court, it was acknowledged that when Gillen inquired about the then-rumored investigation of Haynes, he was told that there was no such investigation; it was also acknowledged that Haynes is, in fact, repaying improperly received funds. Gillen speculated that Haynes was biased against Gillen because, at the time of the hearing, Haynes "had a motive to curry favor with the IBT leadership by doing what the IBT leadership wanted in order to avoid being charged." (Br. at 12)  Gillen did not provide any evidence of "what the IBT leadership wanted" in connection with the IRB-

---

[6] Gillen submitted a July 3, 2007 article which stated Local 237 and the International Union were investigating HMO "consultant" payments received by Haynes. (Br. at Ex. B)  On October 12, 2007, there was another article which stated Haynes, the former Local 237 President, "agreed to repay more than $100,000 of funds he received from a company that manages the union's health plan." (Br. at Ex. B)

12

recommended charge against Gillen, except at oral argument where his counsel noted that Gillen was an "independent minded" Teamster. What inference is to be drawn from this rather neutral fact is not clear. Gillen offered no evidence of any bias against him by Haynes.

As demonstrated in the Chief Investigator's letter of July 8, 2008 and the attachments thereto, the IRB was well aware of Gillen's complaint about Haynes' sitting on the hearing panel. Nevertheless, the IRB found the IBT's proceedings "not inadequate." In light of the extremely deferential standard of review applicable to IRB disciplinary decisions, the IRB's finding must be upheld.

Although Haynes' appointment to a hearing panel at a time when he was seemingly under investigation himself might not represent the best of practices, Gillen's speculative assertions did not support a finding that Gillen was denied a hearing before an impartial tribunal. Cf., United States v. IBT ("Simpson"), 931 F. Supp. 1074, 1106 (S.D.N.Y. 1996) aff'd 120 F.3d 341, 347-348 (2d Cir. 1997) (a claim of bias cannot be supported under any reasonable standard where there is a tenuous chain of inferences without any supporting evidence.); Frye v. United Steelworkers of America, 767 F.2d 1216, 1225 (7th Cir. 1985), cert. denied, 474 U.S. 1007 (1985) (". . . charges that bias undermined the fairness of a disciplinary hearing must be supported by specific factual allegations from which the operation of bias can be inferred."); Yager v. Carey, 910 F. Supp. 704, 715 (D.D.C. 1995) aff'd, 1998 U.S. App. LEXIS 1984 (D.C. Cir. 1998) (". . . specific factual allegations that show the panelists were incapable of hearing plaintiff's case impartially" are necessary to demonstrate an LMRDA violation) (citations omitted); United States v. IBT ("Kikes"), 2007 U.S. Dist. LEXIS 58972, at *14 (citing Frye at 767

13

F.2d at 1224) (allegations which are mere conclusory assertions "fall short of the 'specific factual allegations of bias' required for this Court to find a LMRDA violation.").

The cases Gillen cites in support of his claim of bias are readily distinguishable from the instant case. In Wildberger v. American Federation of Government Employees, 86 F.3d 1188, 1196 (D.C. Cir. 1996), the Court held that a union official was denied a fair hearing under the LMRDA when his political opponent initiated the investigation of the official, supervised the investigation, determined probable cause by bypassing a provision in the union's constitution for a committee of investigation to determine probable cause, chose the hearing panel members and rendered a final decision against the union official. Id. at 1196. Here, the IRB, an independent entity, conducted the investigation and recommended the charge against Gillen. Gillen did not allege, much less prove, any political animus against him by any panel member, and the IBT constitutional provision regarding the GEB's rendering a decision was followed. Thus, Wildberger is inapposite.

In Bolliter v. IBT, 735 F. Supp. 612, 619 (D.N.J. 1989), also cited by Gillen, the Court held that a hearing panel violated the LMRDA when it included both the stepson and brother of one of the charging parties. There, the Court held,

"[w]hen the plaintiff pled his case to the Local, he was looking into the eyes of his adversary's close family members. When Mr. Greenley, on the other hand, literally acting as a prosecutor, rose to speak, he was preaching to an assemblage of his trusted disciples, an assemblage which included his own son and brother. We do not believe that in such a situation a union member's fundamental right to a hearing before an impartial tribunal is satisfied." Bolliter v. IBT, 735 F. Supp. 612, 619 (D.N.J. 1989).

14

In Tincher v. Piasecki, 520 F.2d 851, 654-855 (7th Cir. 1975), on which Gillen

also relied, the Court held that a hearing panel violated the LMRDA when one of the

hearing panel members had been charged by the charged party in a collateral proceeding.

In Kuebler v. Cleveland Lithographers and Photoengravers Union Local 24-P, 473 F.2d

359, 363-364 (6th Cir. 1973), also cited by Gillen, the Court held that a union member

did not receive a full and fair hearing when he was tried before a Board whose

membership was never divulged to him and which was essentially comprised of the same

parties who had investigated the charges against him. None of the factors supporting a

finding of an unfair hearing in these cases was present in the instant matter, and thus

these cases do not support Gillen's position.

Here, Gillen presented no evidence of a personal conflict or political animus

between him and Haynes or other evidence of bias. That Haynes may have been under

investigation on an entirely separate matter does not constitute evidence that Haynes was

biased against Gillen.

### 2. The IBT's Constitution Permitted a Hearing Panel to Conduct an Evidentiary Hearing and to Make a Recommendation to the Full GEB

Gillen argued that Article XIX, Section 4(d) of the IBT Constitution mandated

that an International Officer have an evidentiary hearing before the full GEB, and it does

so state.[7] (Br. at 13-14) But, contrary to Gillen's claim, Article XIX, Section 6 of the

IBT Constitution expressly allowed the General President to appoint a hearing panel to

---

[7] Article XIX, Section 4(d) of the IBT Constitution states:

"Trial of an elective International Officer shall be only before the General Executive
Board at such time and place as fixed by the General Executive Board. The officer
charged shall be found guilty only on a two-thirds (2/3) vote of the uninvolved members
of the General Executive Board who have heard the charges. . . ."

15

conduct an evidentiary hearing and make a written recommendation to the full GEB for its review "[i]n a case where a trial . . . before the [GEB] is required. . . ."[8]  Article XIX, Section 6 of the IBT Constitution specifically allows for the appointment of a hearing panel to "act on behalf of [the GEB] in the holding of hearings and the taking of evidence" and provides that "the ultimate decision of the case, however, shall be made by the Board itself."  In the instant case, three GEB members conducted the evidentiary hearing on the charge against Gillen as Article XIX, Section 6 of the IBT Constitution permitted, and, as the IBT Constitution required, the full GEB rendered a decision on the charge by a two-thirds vote.[9]

Gillen also alleged that the IBT General Counsel and the General President usurped the general authority of the GEB to interpret the IBT Constitution.  (Br. at 15) Contrary to this claim, Article VI, Section 2(a) of the IBT Constitution permits the IBT

---

[8] Article XIX, Section 6 of the IBT Constitution states:

"In a case where a trial . . . before the General Executive Board . . . is required under the provisions of this Constitution, such Board or the General President . . . may have such trial . . . conducted before a panel appointed by the General President . . . Such panel shall consist of one or more uninvolved members and shall act on behalf of such Board in the holding of hearings and the taking of evidence.  No member of the hearing panel or of the Board who is involved in the charges shall participate in the deciding any aspect of this case, as prohibited by Section 1 of this Article . . . .  The panel shall make a full report in writing to the Board, including findings and recommendations for disciplinary action, if any.  The ultimate decision of the case, however, shall be made by the Board itself.

[9] Gillen dismissed Article XIX, Section 6 by claiming that the rules of statutory construction require that a specific provision in a Constitution or a body of laws control over a general one.  (Br. at 16-17)  However, there was no need to rely on rules of statutory construction as there is neither ambiguity nor conflict between the provisions of Article XIX, Sections 4(d) and 6 of the IBT Constitution.

16

General President to interpret the IBT Constitution between meetings of the GEB.[10]

Moreover, the GEB adopted the hearing panel's written recommendation which

considered and rejected Gillen's interpretations of Article XIX, Sections 4(d) and 6 of the

IBT Constitution. (Ex. E at 2-3) Thus, final interpretation was made by the GEB.

### 3. The Three Hearing Panel Members and the IBT General President Were Not "Involved" in the Underlying Charge Against Gillen

Gillen argued that the three hearing panel members and the IBT General President

should not have participated in the GEB's deliberations on the charge against him. (Br.

at 18-21) Article XIX, Section 1(a) prohibits "involved" officers and members from

hearing a charge.[11] Gillen contended that the three GEB members who were on the

hearing panel were transformed into "involved officers" because they conducted the

evidentiary hearing on the charge against him. (Br. at 18-20)[12] Gillen also alleged that

the General President, by filing the IRB-recommended charge against him, became

---

[10] Article VI, Section 2(a) of the IBT Constitution states:

"The General President shall have the authority to interpret the Constitution and the laws of the International Union, including the authority to interpret the Bylaws of subordinate bodies, and to decide all questions of law thereunder between meetings of the General Executive Board . . . ."

[11] Article XIX, Section 1(a) of the IBT Constitution states:

". . . In no event shall any involved officer or member serve on a hearing panel, participate in the selection of a substitute member of a hearing panel, or participate in the decision making process of the trial body. This prohibition shall apply to any proceeding conducted under Article XIX or any other Article of this Constitution."

[12] Gillen argued that the panel members became "involved" in the proceedings when they made proposed recommendations of fact and conclusions to the ultimate decision makers. As such, Gillen contended that the panel members were ineligible to vote on the charge. (Br. at 19) Gillen claimed that the panel members became "involved" members, who had already "made up their minds prior to the trial." Gillen argued that the panel members' presence and participation in the GEB vote was inappropriate because he alleged that these panel members sought only to defend their decision and were not "neutral fact finders." (Br. at 19)

17

"involved" and should not have participated in the GEB's deliberations. (Br. at 21) Gillen cited no IBT constitutional authority or cases decided under the Consent Order for those propositions. The cases Gillen does cite, Kiepura v. Local Union 1091, United Steel Workers of America, 358 F. Supp. 987, 991-91 (N.D. Ill. 1973) and Rosario v. Amalgamated Ladies Garment Cutters' Union, Local 10, I.G.L.U., 441 F. Supp. 657, 662-64, (S.D.N.Y. 1977) aff'd in part, rev'd in part on other grounds, 605 F.2d 1228 (2d Cir. 1979), cert. denied, 446 U.S. 919 (1980), are both distinguishable from the instant matter. In Kiepura, the Court held that a union member and candidate for union office was not afforded a fair hearing when the union official who initiated the charges against the member later participated as one of the hearing panel members and appointed the hearing panel. Id. at 991-992. In Rosario, the Court held that three union members did not receive a fair hearing under the LMRDA when the union official who brought the charges against the union members participated as the Chairman of the Executive Board in hearing and deciding the charge. Id. at 662. When the union members were granted a second trial, the Court found they were again denied a fair hearing when many of the board members who had participated in the first trial sat as board members in the second trial. Id. at 663. Because of these significant factual distinctions, the cases Gillen cites do not support his position.

In United States v. IBT ("Boggia"), 167 F.3d 113, 119 (2d Cir. 1999), which involved another disciplinary proceeding under the Consent Order, the Court of Appeals held that there was no violation of the LMRDA when a union member was tried by two separate panels on the same charges and the then-IBT General President reviewed and adopted both hearing panel decisions. Similarly in Wildberger, 86 F.3d at 1195, where,

as here, the President screened the charge, the Court held that "[t]he fact that the [union] President makes the initial probable cause determination, therefore, does not mean that, after reviewing all the evidence and the recommendation of an impartial trial committee he cannot fairly make the ultimate decision." In Wildberger, "significant danger of bias" occurred only when it was shown that the President – who had initiated the investigation against the charged party, appointed a panel to hear the charge, and also deliberated on this charge – had been a former political adversary of the charged party who had openly criticized him on many occasions. Id. at 1194-1196. As noted above, none of the facts the Wildberger Court found to constitute "danger of bias" is present here.

More applicable to the present facts is the Supreme Court's holding that "[i]t is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law." Withrow, et al. v. Larkin, 431 U.S. 35, 56 (1975). Similarly, in Sawyer v. American Federation of Government Employees, 150 F.3d 31, 36 (2d Cir. 1999), the Court dismissed claims that the LMRDA has been violated where the union President's "acts were in the course of duty and did not arise from any circumstances indicating bias." Here, General President Hoffa was presented with an IRB-recommended charge and supporting evidence. He was not the impetus behind the charge and had no involvement in the investigation. He merely made the administrative decision there were sufficient grounds on which to file the IRB-recommended charge.

Finally, Gillen offered various statements contained in a hearsay declaration of his counsel in order to support of his claim of improprieties during the GEB's deliberations. According to Gillen's counsel's declaration, two GEB members improperly voted on the charge against Gillen because they did not participate in the GEB conference call during which the charge against Gillen was considered. (Br. at 21-22). Gillen's counsel stated that two GEB members voted on Gillen's charge after the conference call because they had been traveling and were unable to be present for the conference call. (Br. Attachment 1 at 3-5). According to the declaration, an anonymous source stated that if the two GEB members had not been polled later, the GEB would not have reached the requisite two-thirds vote to adopt the hearing panel's decision and recommendations. (Br. at 22). Gillen's counsel's declaration did not contain any facts that tended to show these two GEB members had been improperly excluded from the vote. Counsel's declaration stated it was based upon information provided from an anonymous GEB member, and the declaration was unsworn. (Br. Attachment 1)

Gillen argued that under Article XXV of the IBT Constitution, the GEB members must either be present or simultaneously responding to a telephone poll in order to vote. (Br. at 22-23).[13] According to Gillen, because two members of the GEB were called after the vote on the conference call was taken, their votes were improper. (Br. at 22)

---

[13] Article XXV of the IBT Constitution states:

"Unless specifically provided otherwise, wherever this Constitution provides for action by the Executive Board of the International Union . . . the words 'Executive Board' shall mean 'a majority of the members of the Executive Board present and voting at a duly called meeting at which a majority of the members of the Executive Board is present or responding to a telephone or electronic poll.' Actions approved by the poll must be recorded in the minutes of the Executive Board and ratified by a majority of the members of the Executive Board at its next meeting."

Article IX, Section 6 of the IBT Constitution, however, provides that when acting by telephone poll, all GEB members must be polled and does not mandate that GEB members must be simultaneously polled.[14] Thus, even considering Gillen's counsel's unsworn hearsay declaration, there was no violation.

#### 4. Gillen Received a Full and Fair Hearing

In any event, in reviewing the fairness of the hearing procedures under the LMRDA, even in instances where there was a violation of a provision of a union's constitution, "[a] violation of a procedural provision of a union's constitution is actionable only if the violation deprived the party of a full and fair hearing under the LMRDA." United States v. IBT ("Carey and Hamilton"), 247 F.3d 370 (2d Cir. 2001); see Yager v. Carey, 910 F. Supp. 704, 712-13 (D.D.C. 1995) aff'd, 1998 U.S. App. LEXIS 1984 (D.C. Cir. 1998). Here, Gillen was provided with advance notice of the hearing date, written notice of the charge against him, and documentary evidence supporting the charge. See IRB Exs. C, D; see also Carey & Hamilton Discipline, 22 F. Supp. 2d at 143. At the panel hearing, Gillen was represented by counsel and presented witnesses and evidence in his defense. See IRB Ex. D; Carey & Hamilton Discipline, 22 F. Supp. 2d at 143. Accordingly, Gillen cannot demonstrate he did not receive a full and

---

[14] Article IX, Section 6 of the IBT Constitution provides:

"In all matters requiring action by the General Executive Board, and when the General Executive Board is not in formal session, the General Executive Board may act by telegram, letter, TITAN communications, electronic mail, or long distance telephone. When the General President requires action by the General Executive Board, and such members may take action on the matter; provided, however, that whenever action is sought by any of the foregoing methods, all members of the General Executive Board must be polled. Such action so taken by a majority of the members of the General Executive Board shall constitute action of the General Executive Board as though the General Executive were in formal session; provided, however, that any such action shall be confirmed at the next formal session of the General Executive Board.

fair hearing and thus that his disciplinary proceedings violated the LMRDA.

### III. The IRB's Determination of Sanction

Gillen challenges the three-year suspension from membership and five-year bar from holding IBT office or employment as "extreme." Gillen Objections, at 26-27. Specifically, he claims that the hearing panel relied on cases involving "individuals who were guilty of multiple charges far more extensive than the single charge of failure to cooperate with the IRB." Id., at 26. For the reasons set out below, Gillen's arguments are without merit.

It is well established that a "district court reviews penalties imposed by the IBT in accordance with the Consent Decree under an 'arbitrary and capricious' standard." Boggia, 167 F.3d at 120. In reviewing IRB sanctions, this Court asks only whether the sanction imposed represents an "allowable judgment" in the choice of the remedy. United States v. IBT ("Wilson, Dickens, Weber"), 978 F.2d 68, 73 (2d Cir. 1992) (citation omitted). "[T]he reviewing court should not overturn the . . . choice of sanctions unless it finds the penalty unwarranted in law or without justification in fact." Simpson, 120 F.3d at 348 (citing Wilson, Dickens, Weber, 978 F.2d at 73); see also United States v. IBT ("Bane"), No. 88 Civ. 4486 (LAP), 2002 WL 654128, AT *16 (S.D.N.Y. 2002) ("The relevant inquiry with respect to an IRB sanction is not whether the Court agrees or disagrees with it but rather is limited to whether the IRB made an allowable judgment in its choice of remedy.") (citation omitted), aff'd, 59 Fed. Appx. 424 (2d Cir. Mar. 13, 2003). Given that the IBT Constitution specifically provides for suspension from membership and a bar on holding office as appropriate disciplinary sanctions, see Article XIX, Section 10(a), the sanction imposed on Gillen is an allowable judgment.

22

Moreover, Gillen errs in his attempt to compare his sanction to those issued to other IBT members. As this Court has held, "it is well established that sanctions given in other cases are not relevant to the Court's inquiry as to whether a particular sanction is unwarranted or without justification." Bane, 2002 WL 654128, at *16 (citing United States v. IBT ("Giacumbo"), 170 F.3d 136, 144 (2d Cir. 1999) ("Uneven application of sanctions does not normally render the sanction imposed in a particular case arbitrary and capricious.")); Kikes, 2007 WL 2319129, at *4 (same); see also United States v. IBT ("Sansone"), 981 F.2d 1362, 1372 (2d Cir. 1992) ("the apparent discrepancy between the penalty imposed here and those imposed in other cases does not inexorably compel the conclusion that the Independent Administrator acted arbitrarily and capriciously"); Carey & Hamilton Discipline, 22 F. Supp. 2d at 142 ("Even assuming that Carey could demonstrate some discrepancy between the penalty imposed upon him and the penalties imposed in prior proceedings, it is in the province of the IRB to determine the appropriate punishment in each proceeding.") In any event, other IBT members, including Michael Bane, have been permanently barred from the IBT for lying about their knowing association with members of organized crime or with a barred member.

Finally, Gillen's challenge to the sanction imposed for his false testimony is especially unwarranted in light of the consideration given by the IBT to mitigating factors in his favor. As set forth in the hearing panel's Report and Recommendation, the IBT considered factors such as Gillen's long history of service with the union and the nature of his contacts with the barred party in its consideration of an appropriate penalty. See IRB Ex. E, at 14-15.

## Conclusion

For the reasons set out above, Application 128 is granted, and the IRB's "not inadequate" finding with respect to the charge against Francis J. Gillen is upheld.

SO ORDERED:

Dated: July 14, 2008

*Loretta a Preska*

LORETTA A. PRESKA, U.S.D.J.

Copies mailed to:

Arnold S. Hoffmann, Esq.
Wiseman & Hoffmann
450 Seventh Avenue, Suite 1400
New York, NY 10123

Paul Knight, Esq.
1666 K Street, N.W., #500
Washington, DC 20001

Bradley T. Raymond, Esq.
Office of the General Counsel
International Brotherhood of Teamsters
25 Louisiana Avenue, N.W.
Washington, DC 20001

Wendy H. Waszmer, Esq.
Assistant United States Attorney
Office of the United States Attorney
86 Chambers Street, 3rd floor
New York, NY 10007

Charles M. Carberry, Esq.
Office of the Chief Investigator
International Review Board
17 Battery Place, Suite 331
New York, NY 10004

John J. Cronin, Jr.
Administrator
Independent Review Board
444 North Capitol Street, N.W., Ste. 528
Washington, DC  20001

lbtorder128