MAILED TO COUNSEL

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____              │
│ DATE FILED: _____        │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------X
                                :
UNITED STATES,                  :    88 CV 4486 (LAP)
                                :
         v.                     :    MEMORANDUM AND ORDER
                                :
INTERNATIONAL BROTHERHOOD OF    :
TEAMSTERS, et al.,              :
                                :
              Defendants.       :
                                :
--------------------------------X

RE: IRB APPLICATION 131 (DON HAHS)

　　　　　The Independent Review Board ("IRB") of the
International Brotherhood of Teamsters ("IBT") submitted
Application 131 concerning disciplinary action taken
against Don Hahs ("Hahs"), former National President of the
Brotherhood of Locomotive Engineers and Trainmen ("BLET"),
a division of the IBT's Rail Conference. Based on the
recommendation of the IRB, Hahs was charged with breaching
his fiduciary duty to ensure that union funds be spent only
for union purposes. Despite the voluminous exhibits
received at the hearing, the case is really quite straight
forward. Hahs was charged with causing the BLET to pay for
Cleveland Cavalier playoff and season tickets, his wife's
travel expenses, and other personal expenses for which
there was no union purpose. The charge was upheld by the
IBT after a trial before a hearing panel. Following the

submission of objections by Hahs, the IRB found that the IBT's decision upholding the charge against Hahs was "not inadequate."

For the reasons set forth herein, Application 131 is granted, and the IRB's "not inadequate" finding with regard to the charge against Hahs is upheld.

BACKGROUND

A.    Proceedings Regarding the IRB-Recommended Charge Against Hahs

On September 13, 2007, the IRB referred to the IBT its charges that Hahs had embezzled and breached his fiduciary duty by causing the BLET to pay for non-union related expenses, in violation of Article II, Section 2(a), and Article XIX, Sections 7(b)(1), (2), and (3) of the IBT Constitution. See Application 131, Ex. A, at 2. Specifically, the IRB recommended that the IBT file charges against Hahs for causing the BLET to purchase Cleveland Cavalier playoff and season tickets for the 2004-2006 seasons. Id. at 5-14. The IRB also recommended that the IBT file charges against Hahs for causing the BLET to incur expenses for his wife, Janice Hahs, who was not a BLET member or employee, to travel to numerous BLET events and for his grandson, Derek Hahs, to attend BLET events. Id. at 15-38.

2

On September 24, 2007, the IBT's General
President James P. Hoffa ("IBT President Hoffa") filed the
IRB-recommended charges.  See Ex. C.  Hahs' counsel
requested that the charges be referred to the IRB for
"further proceedings" because the charges were "complex"
and would involve interpretation of the merger agreement
under which the BLET became a division of the IBT.  See
Ex. B.  The IBT granted Hahs' request to refer the matter
to the IRB.  See Ex. C.  By letter dated October 16, 2007,
the IRB notified the IBT of its determination that "there
is no basis for a request for the IRB to hear this matter."
Ex. F.  The IRB referred the charges back to the IBT, and
IBT President Hoffa appointed a panel to hear the charges
against Hahs.  See Ex. G.  The three members of the hearing
panel were Denis Taylor, President of Teamsters Local 355,
Stan Hennessy, President of Teamsters Local 31, and Robert
Svob, Jr., a BLET member.  See Ex. K, at 1-5.

The hearing panel heard testimony from Hahs, who
was represented by counsel, and seven witnesses called by
Hahs on February 4, and 5, 2008.  See Ex. K, at 1-5, 261-
63.  By letter dated March 14, 2008, IBT President Hoffa
advised Hahs that he had adopted the Report and
Recommendation of the hearing panel (1) holding that Hahs
"improperly caused the Union to expend funds where there

3

was no Union purpose for the expenditures and in circumstances that were calculated to benefit himself personally," Ex. L, at 11-14, and (2) recommending that Hahs be fined $44,963.97, the net expenditure by the BLET for the Cleveland Cavalier tickets and the travel expenses of Janice Hahs, that Hahs be removed from BLET office and employment until 2010, the end of his term as BLET President, and suspended from BLET membership for one year, see id. at 14-16 (the "IBT Decision").

Hahs submitted his objections to the IBT Decision to the IRB on May 1, 2008, asserting that (i) he was erroneously fined the entire cost of the Cleveland Cavalier tickets because the tickets had been used by other BLET members, see Ex. O, at 6; (ii) the imposition of a fine in the amount of his wife's travel expenses ignored testimony regarding the BLET's "long traditions and practices" regarding the travel of spouses, see id. at 8; and (iii) "the promise of autonomy extended by the IBT to the BLET in the unions' 2004 merger requires reversal of the fine assessed by the IBT in these proceedings," see id. at 13-15. By letter dated May 13, 2008, the IRB advised Hahs of its determination that the IBT Decision was "not inadequate."

4

B.    Application 131

On June 19, 2008, the IRB submitted to this Court Application 131, seeking a ruling upholding May 13, 2008 decision finding that the IBT Decision was "not inadequate."

The Consent Decree provides that the IRB shall monitor disciplinary actions taken by any IBT entity on IRB-recommended charges to determine whether the charges were "pursued and decided" by that IBT entity "in a lawful, responsible, or timely manner" and whether the resolution of those charges is "inadequate under the circumstances." Consent Decree ¶ G(f); see also IRB Rules ¶ I(7).

Although the Consent Decree contains no express procedure by which a union member disciplined by an IBT entity on IRB-recommended charges may appeal such a "not inadequate" determination to this Court, the IRB has followed a practice of facilitating judicial review of its "not inadequate" determinations when a charged party demonstrates his intention to seek review of a "not inadequate" finding.  See United States v. IBT (Gillen), 88 Civ. 4486 (LAP), 2008 WL 2743695, at *2 (S.D.N.Y. July 14, 2008); see also United States v. Boggia, 167 F.3d 113, 120 (2d Cir. 1999) (upholding district court's affirmance of IRB "not inadequate" determination); Sombrotto v. IBT, No.

5

01 Civ. 9285 (LAP), 2003 WL 252156, at *4 (S.D.N.Y. Feb. 3,
2003) ("This Court may also review IRB determinations that
union discipline is 'not adequate' when requested by the
IRB."). Accordingly, the IRB submitted Application 131, by
which the IRB requested that the Court adopt the IRB's
determination that the IBT handling of the charge against
Hahs was "not inadequate."

Discussion

I.    Standards of Review

     A.    Review of IRB Decisions

          The standards governing review of IRB
disciplinary decisions are well established.  This Court
reviews determinations made by the IRB under an "extremely
deferential standard of review."  United States v. IBT
("Carey & Hamilton"), 247 F.3d 370, 379 (2d Cir. 2001);
United States v. IBT ("Simpson"), 120 F.3d 341, 346 (2d
Cir. 1997); United States v. IBT ("DiGirlamo"), 19 F.3d
816, 819-20 (2d Cir. 1994), cert. denied, 513 U.S. 873
(1994).  The IRB Rules, which were approved by this Court
and the Court of Appeals, provide for review of decisions
of the IRB under "the standard of review applicable to
review of final federal agency action under the
Administrative Procedure Act."  IRB Rules ¶ O; see United
States v. IBT ("IRB Rules"), 803 F. Supp. 761, 805-06

6

(S.D.N.Y. 1992), aff'd as modified, 998 F.2d 1101 (2d Cir. 1993). Under this extremely deferential standard, an IRB decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Carey & Hamilton, 247 F.3d at 380 (quoting 5 U.S.C. § 706(2)(A)).

        In accordance with that standard, this Court reviews "the IRB's findings of fact for 'substantial evidence' on the whole record." United States v. IBT ("Giacumbo"), 170 F.3d 136, 143 (2d Cir. 1999). "The substantial evidence test is deferential." Id. "Substantial evidence is 'something less than the weight of the evidence,'" Simpson, 120 F.3d at 346 (quoting DiGirlamo, 19 F.3d at 820), "but something 'more than a mere scintilla,'" id. (quoting United States v. IBT ("Cimino"), 964 F.2d 1308, 1311-12 (2d Cir. 1992)). "Substantial evidence includes such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotations omitted). Moreover, the mere possibility of drawing two inconsistent conclusions from the evidence does not prevent the IRB's findings from being supported by substantial evidence. Carey & Hamilton, 247 F.3d at 380 (citations omitted). The IRB's findings cannot be overturned merely by identifying

alternative findings that could potentially be supported by
the evidence. See Arkansas v. Oklahoma, 503 U.S. 91, 113
(1992) ("The court should not supplant the agency's
findings merely by identifying alternative findings that
could be supported by substantial evidence."). Rather, the
Court must find that the evidence "not only supports [a
contrary] conclusion, but compels it." INS v. Elias-
Zacarias, 502 U.S. 478, 481 n.1 (1992) (emphasis supplied).

## B.    Fiduciary Duty of Union Officers

The nature of the fiduciary duty owed to the
Union by its officers is also well-settled. "As a
fiduciary, an IBT officer enjoys the trust of the general
membership. In exchange for this privilege, each officer
is bound to serve the membership's interest." United
States v. IBT ("Ross"), 826 F. Supp. 749, 756 (S.D.N.Y.
1993), aff'd, 22 F.3d 1091 (Table) (2d Cir. 1994) (internal
marks omitted); see also United States v. IBT ("Sansone"),
981 F.2d 1362, 1368 (2d Cir. 1992) ("Every IBT officer is a
fiduciary with respect to the Union members, and has a duty
to disclose and remedy wrongdoing by the IBT.") (internal
marks omitted). The Court of Appeals has held the duty to
be expansive, noting that it is the duty of each Union
official "to refrain from dealing with the [IBT] as an

8

adverse party . . . in any matter connected with his
duties." Carey & Hamilton, 247 F.3d at 381 (emphasis
added). Nor is an officer's fiduciary duty satisfied
through "passivity and willful ignorance." United States
v. IBT ("Sansone"), 792 F. Supp. 1346, 1354 (S.D.N.Y.
1992), aff'd, 981 F.2d 1362 (2d Cir. 1992). IBT officers
cannot avoid responsibility "by shutting their eyes to
allegations" that their fellow IBT members engage in
corrupt or improper activity. United States v. IBT
("Coli"), 803 F. Supp. 748, 755 (S.D.N.Y. 1992).


II.  Application

            Applying these standards, the IRB's determination
with respect to Hahs is easily affirmed.  The IRB acted
well within its discretion when it upheld the IBT Decision
finding that Hahs had breached his fiduciary duty by
causing the BLET to expend union funds for non-union
purposes.  The IRB also acted within its discretion in
upholding the penalty imposed on Hahs – a fine in the
amount of the BLET's net expenditures for the Cleveland
Cavalier tickets and Janice Hahs' travel expenses, removal
from BLET office and employment until 2010, and suspension
from BLET and IBT membership for one year.

9

A.   The IRB's Decision Upholding the IBT's
Finding that Hahs Breached His Fiduciary
Duty is Supported by Substantial Evidence

The IRB acted well within its discretion in

upholding the IBT's finding that "Hahs improperly caused

the Union to expend funds where there was no Union purpose

for the expenditures and in circumstances that were

calculated to benefit himself personally." See Ex. L, at

10-14.

As National President of the BLET, Hahs had a

fiduciary obligation to ensure that union funds were used

only for union purposes. See 29 U.S.C. § 501(a) (duty of

union officers to "hold its money and property solely for

the benefit of the organization and its members and to

manage, invest, and expend the same in accordance with its

constitution and bylaws"); IBT Constitution, Article XIX,

Section 7(b)(3) (prohibiting embezzlement or conversion of

funds); see also Carey and Hamilton, 247 F.3d at 381 (IBT

President "had fiduciary obligations to IBT members in

handling the union's money").

Substantial evidence in the record supports the

IBT's finding that Hahs caused the BLET to incur expenses

for (1) Cleveland Cavalier tickets for the 2004-2006

seasons, which were not used for union purposes; and (2)

10

his wife's travel to union meetings and events, for which
she had no identifiable union role. None of the objections
raised by Hahs is sufficient to undermine the IBT's
decision, as affirmed by the IRB in its "not inadequate"
finding.

> 1. Purchase of Cleveland Cavalier
> Tickets from 2004-2006

As the IBT noted in its decision, courts have
recognized the "potential impropriety of using union funds
to purchase sports tickets for use by union officers." See
Ex. L, at 10 (citing Brink v. DaLesio, 496 F. Supp. 1350,
1364 (D. Md. 1980), rev'd in part on other grounds, 667
F.2d 420 (4th Cir. 1982)); cf. United States v. IBT
("Perrucci"), 965 F. Supp. 493, 501-02 (S.D.N.Y. 1997)
(affirming IRB-referred kickback charges regarding receipt
of free Yankees tickets). For the following reasons,
substantial evidence supports the IBT's decision finding
that Hahs breached his fiduciary duty when he caused the
BLET to purchase Cleveland Cavalier tickets for the 2004-
2006 seasons.

First, the record evidence supports the IBT's
conclusion that Hahs "maintained control over the tickets"
and used them for his personal benefit. Ex. L, at 11.
There is no dispute as to the following facts in the

11

record: (1) Hahs caused the BLET to purchase playoff and
season tickets, see Ex. 1, 70-75; Ex. L, at 11-12; Ex. 5,
at 167, which cost $47,880 over three years, Exs. 8, 10-16;
(2) Hahs kept the tickets in his office drawer and only
gave them to others for distribution when he was out of
town, see Ex. 1, at 72-73; (3) Hahs attended no fewer than
19 games himself, with his wife or with his grandson,
including two of three playoff games in 2006, see Ex. 1, at
70, 74-75, 86-91, Ex. K, at 420-21; (4) Hahs kept no
records regarding other individuals' use of the tickets,
see Ex. 1, at 72-75, 83; Ex. 5, at 176-77; and (5) eight
days after the IRB conducted sworn examinations during
which various BLET officers and BLET employees were
questioned about the purchase of Cleveland Cavaliers
tickets, on April 20, 2007, the BLET cancelled the
seat/license agreement with the Cleveland Cavaliers.
(Ex. L at 4; Exs. 98-99). Accordingly, the IBT properly
found that Hahs controlled and used the Cleveland Cavaliers
tickets.

The IBT also found that Hahs failed to
demonstrate any union purpose for the purchase of the
tickets. See Ex. L, at 11. Hahs claimed that the tickets
were purchased to support the city of Cleveland and the
Cleveland Cavaliers team but failed to explain how these

12

interests relate to any identifiable union purpose.  See Ex. 1, at 71-72.  To the contrary, however, the IBT found, Hahs' repeated efforts to justify the tickets as a way to help the City of Cleveland and the Cleveland Cavaliers manifest an obvious lack of Union purpose for the tickets. He repeated this clearly non-Union related purpose during his testimony when he expressed his concern that Cleveland was in danger of losing the Cavaliers to another city.  He was free to support Cleveland and its home team on his own dime, but there is no justification for spending members' dues money for this purpose.  (Ex. L at 11).  The IBT therefore properly concluded that Hahs' proffered reasons "manifest[ed] an obvious lack of Union purpose for the tickets."  See Ex. L, at 11.

The IBT also properly rejected Hahs' other proffered reason for purchasing the tickets, which was that the tickets were purchased as a marketing tool to attract new tenants to the BLET's Standard Building in Cleveland. See Ex. 1, at 71, 76-77, 82-84.  The BLET established the BLET Building Association ("Building Association"), a non-profit Ohio corporation, to hold and operate the Standard Building, a 24-story office building in Cleveland, Ohio, which the BLET owned.  (Ex. 4; Ex. 5 at 8, 162-163).  In 2004, 2005 and 2006, Hahs caused the Building Association

13

to purchase season tickets to Cleveland Cavaliers basketball games. (Ex. L at 8, 11-12, 16; Ex. 5 at 167-172, 184). From 2004 to 2006, Hahs directed National BLET Secretary-Treasurer William Walpert ("Walpert") to use funds from the Building Association's checking account to purchase regular season and playoff tickets. (Ex. L at 3; Ex. 1 at 71-74, 76, 80-84; Ex. 5 at 167, 170, 184). The funds expended were $13,120, $21,860 and 12,900 respectively for a total of $47,880 for the three years. (Ex. 8; Exs. 10-16). As the IBT found, "Hahs then caused the BLET to issue corresponding payments to the Building Association that matched each payment from the Building Association to the Cleveland Cavaliers for the tickets. So, in reality, the tickets were purchased by the Union." (Ex. L at 3; Exs. 8-14, 18). After taking into account credits and refunds, the BLET's net expenditure for the tickets was $37,012 between January 2004 and December 2006. (Ex. L at 14-15). The record evidence fails to support Hahs' contention that the tickets were primarily a marketing tool. There is no evidence in the record that any tenant or prospective tenant used any of the tickets from 2004-2006, including, as noted above, the playoff tickets. Indeed, the IBT found that "the sole occasion on which tickets were provided to any tenant or prospective

14

tenant occurred in May 2007, at least a month after

questions regarding the tickets were raised with Hahs

during his sworn IRB examination." Ex. L, at 12; see also

id. at 8. The tickets were never offered or conveyed to

the building manager, Michael Loomis, even though Loomis

was responsible for leasing space to new tenants and had

been charged with previous marketing initiatives, such as

ordering calendars as tenant gifts. See Ex. 1, at 76-77;

Ex. K, at 477-78; Ex. 125, at 33-39, 40-43. Instead, Hahs,

who had no professional responsibilities for or interaction

with the tenants, kept the tickets in his office drawer and

by himself decided who would use them. See Ex. 1, at 72-

75; cf. Perrucci, 965 F. Supp. at 501-02 (affirming IRB-

referred charges where there was "no formal ticket

distribution mechanism, and no records exist concerning the

ultimate recipients of the Yankee tickets.").

        The lack of records relating to the use of the

tickets also undermines Hahs' claim that the tickets were

purchased to attract new clients. According to Loomis,

with previous marketing initiatives, lists had been kept of

tenants receiving gifts or promotions, e.g., calendars, and

the gifts for all tenants did not usually exceed $1,200 in

total. See Ex. 125, at 49-50. The most costly initiative

Loomis recalled was giving umbrellas to tenants, which cost

15

$7,680. See id. at 51-53. In contrast, the total
expenditure for the Cleveland Cavalier tickets was $47,880,
see Exs. 8, 10-16, and no records were kept with regard to
tenants who were offered or used the tickets, see Ex. 1, at
72-75, 83; Ex. 5, at 176-77. These facts do not suggest
any real intention to use the tickets to attract new
tenants for the Standard Building. For these reasons, the
IBT's finding that Hahs caused the BLET to purchase the
Cleveland Cavalier tickets for non-union purposes was
supported by substantial evidence, and the IRB properly
found the decision "not inadequate."

2.    Travel Expenses of Janice Hahs

The IBT found that, "Hahs breached his fiduciary
duty to the Union and its members by causing the Union to
pay for his wife's travel expenses, as well as for an
excessive number of in-room movies and for his grandson's
registration at several Union events." (Ex. L at 13-14).
More specifically, the evidence showed that Hahs caused the
BLET to pay for his wife's travel expenses for which there
was no union purpose. Hahs caused the BLET to pay for his
wife's airline tickets and registration fees at various
BLET and non-BLET functions throughout the country. She
was never a member of the union, and her presence at the
functions was not for a union purpose. (Ex. L at 9, 13;

16

Ex. 1 at 41, 45; Ex. 5 at 65). Between January 2004 and
December 2006, Hahs caused the BLET to pay $7,951.97 in
personal travel expenses for his wife. (Exs. 56, 67-68,
74).[1]  Payment for spouses to accompany officers is a non-
union expense. Investigations Officer v. Baccaro, Decision
of the Independent Administrator (June 23, 1992).[2]

        Hahs charged his wife's travel expenses on the
BLET's credit card. (Ex. L at 5, 9, 13-14; Exs. 56, 67-68,
74). Although Hahs claimed that some of his wife's travel
was connected to the Grand International Auxiliary ("GIA"),
his wife never served as an officer or a delegate of the
GIA.  (Ex. L at 5, 9, 13). The GIA is an organization that
"exists to support the interest and welfare of the
Brotherhood of Locomotive Engineers and Trainmen."
(Exs. 49-51, 53-54).[3]

_____

[1] Hahs caused the BLET to pay $1,687.70 for his wife to
attend BLET regional conferences and $6,264.27 for his wife
to attend non-regional conferences. (Exs. 67-68; Ex. 74).

[2] The IBT's October 2000 release, "Local Union
Financial and Administrative Policies" stated that, "[i]t
is not proper for the Local Union to pay for personal
expenses" such as "travel expenses of family members" or
"meal expenses of family members." (Ex. L at 6; Ex. 106).

[3] The GIA was a separate entity, independent from the
BLET, and has its own set of Bylaws. (Exs. 50-51; Ex. 55).
The GIA members were not members of the BLET. (Ex. 24 at
22; Exs. 50-51). Mrs. Hahs was a member of GIA 7 in
Atlanta, Georgia (Ex. 34).

17

From 2004 to 2006, Hahs caused the BLET to pay
$1,687.70 for his wife's expenses, such as airfare and
registration fees, to attend various BLET regional
conferences.  (Exs. 37-47; Exs. 56-63, 67).[4]  In addition to
these regional conferences, Mrs. Hahs also accompanied her
husband, at union expense, on other trips.   Between
January 2004 and December 2006, Hahs caused the BLET to pay
$6,264.27 for his wife's airline tickets for these
additional trips.  (Ex. 1 at 97-98, 110-111; 120-122, 147-
150, 167-168, 188-191, 213-214, 233-234, 240-241, 257-258;
Ex. 28; Exs. 56-63; Exs. 68-91; Ex. 95; Exs.100-101).

The IBT's finding that Hahs breached his
fiduciary duty by seeking reimbursement for his wife's
travel expenses is also supported by substantial evidence
because Hahs failed to identify any union purpose for his
wife's attendance at these meetings.

First, the IBT properly found that the BLET's
travel policy only addresses the travel of BLET employees
and has no provision for the travel of spouses.  See Ex. L,

---

[4] There was testimony from several BLET officers that
the BLET National President was permitted to bring his wife
to one regional conference each year at union expense.
(Ex. L at 9).  Accordingly, in the IRB report recommending
the charges against Hahs, Hahs was given credit each year
for the most expensive regional conference trip his wife
incurred at BLET expense.  (Ex. A at 21, fn. 19; Exs. 37-
47; Exs. 56-63; Ex. 67).

18

at 13.   The policy provides for reimbursement to "employees
for all reasonable and necessary expenses while traveling
on authorized organization business."   See Ex. 107
(emphasis added).   As noted above, Janice Hahs was not a
BLET member or employee, see Ex. 1, at 41, 45, but
nevertheless, the evidence showed that over a three-year
period, the BLET reimbursed Hahs for expenses related to
his wife's travel and attendance at 20 BLET regional
conferences and 17 other BLET meetings.   See Exs. 67-68.
As Janice Hahs was not a BLET employee, her expenses could
not be coded on a BLET expense report and were listed under
Hahs's expenses.   See Ex. 25, at 73-74.   For these reasons,
the IBT properly found that Hahs had "expanded" on
established BLET travel practices.   See Ex. L, at 13.

        Second, the IBT also reasonably determined that
Hahs failed to demonstrate that his wife engaged in any
union functions while attending the BLET meetings.   The IBT
was "unwilling to conclude that paying for his wife's
travel to Union meetings and events so that he was not a
'fifth' wheel at ancillary social events or so that she
could attend social events 'with other women' served a
legitimate union purpose."   Ex. L, at 13.   Indeed, the
record showed that Janice Hahs did not have a leadership
role or any significant involvement in any of the BLET

meetings to which she traveled. See, e.g., Ex. 1, at 114-
15 (no documentation showing Janice Hahs' role at meetings
she attended); at 188-89 (no memorialization of any action
taken by Janice Hahs at Western General Chairman's
Association meeting, purpose of her attendance was to
"socialize" and "be around with the other presidents and
their wives,"); id. at 191-92 (role at General Committee
meeting in Memphis was to "help[] with socializing with the
women there and visit with the designated council"). Nor
does the record support Hahs' contention that his wife's
duties included attending events and reporting back to BLET
members on news or developments from the meetings. See,
e.g., Ex. K, at 496 (no indication that Janice Hahs
prepared report to BLET members or spouses after attending
Democratic National Convention); Ex. 1, at 168-69 (after
meeting in Ft. Lauderdale, Hahs reported back on events,
not his wife). Further demonstrating the personal, rather
than professional, nature of Hahs' wife's attendance at
union meetings, Hahs justified her travel to a St. Louis
meeting because it had been an "educational experience" for
her, see id. at 499-500, hardly a union purpose.

Nor does the record reflect that the travel
expenses of Janice Hahs were justified by her involvement
in the Grand International Auxiliary ("GIA"), an

20

organization created to support the interests of BLET

members and their families, of which many spouses are

members.  See Exs., 53-55.  Becky Schneider, GIA's National

President, testified at the IBT hearing that although

Janice Hahs was involved in the GIA, she had a significant

role in only one of twelve GIA conferences that were held

from 2004 to 2006.  See Ex. K, at 255-56.

     Nor did Janice Hahs' status as a member of the

GIA justify the reimbursement of her travel expenses.

Under the GIA's Bylaws, officers generally pay for their

own travel expenses.  See Ex. 55, at 4-9.  Furthermore, GIA

President Schneider testified that although the GIA paid

travel expenses for members to attend meetings on certain

occasions, the GIA policy regarding reimbursement did not

apply to Janice Hahs because she was not a national officer

of the GIA.  See id. Ex. K, at 248-50.  As Janice Hahs'

travel expenses should not have been reimbursed under

either the BLET's travel policy or the GIA's Bylaws, and

Janice Hahs did not play any significant role in the

affairs of either entity, the IBT properly found that her

expenses were not incurred for union purposes.  Indeed, in

similar factual contexts, courts have upheld charges of

embezzlement.  See United States v. Oliva, 46 F.3d 320, 322

(3d Cir. 1995) (embezzlement charges based on union payment

21

for airline tickets of union employee, his wife and
children); United States v. Nell, 526 F.2d 1223, 1226-28
(5th Cir. 1976) (embezzlement charges based on union payment
for members' trip to Europe with spouses).

Furthermore, Hahs' contention that the
reimbursement for these expenses was justified because his
"predecessors and successors also travelled extensively
with their wives at union expense," Hahs Objections, at 16,
is unavailing. As an initial matter, none of the
"traditions and practices" cited by Hahs regarding spousal
travel, see Hahs Objections, at 15, are reflected in the
BLET's Bylaws or travel policy. See Ex. L, at 13; Ex. 107.

To the extent that the record reflects the
informal understanding of BLET Presidents and officers that
(1) vice presidents could take their spouses on one
regional meeting per year at the BLET's expense, and (2)
the BLET President could bring his spouse to events as
"appropriate," see Ex. K, at 84-85, 121-22, 150-51, 195-96,
as noted above, Hahs plainly exceeded an "appropriate"
expenditures. Hahs testified that he did not need approval
from the BLET to charge his wife's travel expenses to the
union, see Ex. 1, at 41-43, and that he believed that his
wife's meals, as well as meals where his "wife is
entertaining other members' wives" could be charged to the

22

union, see id. at 133-34, 196-97, 211-12.  When the
appropriateness of his wife's expenses was raised by
another Executive Committee member, William Walpert, as
well as the BLET employee who handled the union's expense
reports, Patty Smith, in 2004 and 2005, Hahs responded by
continuing to expense his wife's travel through 2006.  See
Ex. 1, at 44, Ex. 5, at 72-74, Ex. 21, at 76-77.  Hahs
further demonstrated his willing and intentional use union
funds for personal use when he charged his grandson's
registration fees, Ex. L, at 13, Ex. 66, and multiple in-
room movies per day, even though he thought the rule was
"one movie per day," see Ex. A, at 27-28, Ex. 1, at 473-74.
Although Hahs acknowledged that there was no union purpose
for his grandson, who was neither a BLET member nor a BLET
employee, to attend these conferences (Ex. 1 at 117-120)
and later reimbursed the BLET for these expenses, see Ex.
L., at 15, that he charged these amounts to the union
undermines his assertion here that he sought reimbursement
for appropriate expenses based on previous BLET practices.
The IBT thus properly found that Hahs had breached his
fiduciary duty to the BLET by charging his wife's travel
expenses.

        For these reasons, it was not arbitrary or
capricious for the IRB to uphold the IBT's finding that

Hahs breached his fiduciary duty in causing the BLET to
expend union funds for non-union purposes.

      B.    Hahs Fails to Establish Any Procedural Defect in
            His IBT Hearing Based Purported "BLET Autonomy"
            <u>After the 2004 Merger of the BLET and IBT</u>

Hahs' objections to Application 131 also fail to
identify any procedural defect in his IBT hearing process,
and his argument that the BLET's Bylaws "prohibit the IBT
and IRB from imposing any discipline" against him, <u>see</u> Hahs
Objections, at 9, is wholly without merit.

          1.    Hahs is Bound by the Consent Order
               Procedures

In his submission, Hahs claimed that, "[t]he IBT
and IRB lacked jurisdiction to impose sanctions against
Hahs because of the autonomous power reserved to the BLET
under the merger.  Only the BLET Advisory Board held
authority to discipline the elected National President of
the BLET's 55,000 members." (Br. at 21).  In his
submission, Hahs also alleged that,

> [b]ased upon the Merger Agreement, the IBT and
> IRB should have assured fairness and internal
> union due process and rejected efforts to hold
> Hahs and the BLET retroactively responsible
> for full compliance with the Consent Decree
> and its 19 year history of the application to
> the Teamsters.

(Br. at 8). The conduct at issue here unquestionably falls within the Consent Order.

All IBT members, such as Hahs, are bound by the Consent Order procedures. United States v. IBT [Friedman and Hughes], 905 F.2d 610, 622-623 (2d Cir. 1990); United States v. IBT [Adelstein], 998 F.2d 120, 124 (2d Cir. 1993). Paragraph G of the Consent Order grants the IRB authority to investigate corruption within the IBT and to recommend disciplinary charges to the appropriate IBT entity. The Merger Agreement between the IBT and the BLET could not and did not alter the Consent Order. (Hahs Ex. B-1). When Hahs became an IBT member, he came within the scope of the Consent Order.

As the IBT found, Hahs acknowledged being aware of the Consent Order. (Ex. K at 466; Ex. L at 7). Moreover, the Consent Order provisions regarding the IRB were specifically incorporated into the IBT Constitution, with which Hahs, as the National President of the BLET, should have been familiar. (Ex. K at 467-68). Significantly, the IRB-recommended charge against Hahs concerned conduct after January 1, 2004 when the BLET merged with the IBT and Hahs became an IBT member. (Ex. A). The applicable Consent Order procedures were followed, and Hahs received a full and fair hearing: he

received notice of the charge and the evidence against him
before the hearing, he was represented by counsel,
testified on his own behalf and presented witnesses.
(Ex. K).

Hahs claimed that under the BLET Bylaws, the BLET
National Advisory Board should have been the entity to hear
the charge against him.  (Br. at 9).  This ignored that the
IRB, under the Consent Order provisions which were
incorporated into Article XIX, Section 14 of the IBT
Constitution, also has the power to recommend a charge
against IBT members, including BLET officials such as Hahs.
Cf, United States v. IBT [Friedman and Hughes], 905 F.2d at
617-619 (both IBT and court officers have disciplinary
jurisdiction over members).[5]  Moreover, the Merger Agreement
between the BLET and the IBT provided that Article XIX of
the IBT Constitution, which, as noted above, contained the
Consent Order provisions regarding the IRB, applied to
disciplinary charges filed after the effective date of the

_____

[5] Under the disciplinary provisions of the IBT
Constitution, IBT entities have the authority to hear
charges initiated from within the IBT.  Under the Consent
Order and the IBT Constitution, the IRB also has the
authority to recommend disciplinary charges to an
appropriate IBT entity.  Pursuant to Article XIX,
Section 14(c)(1) of the IBT Constitution, the IRB has the
authority to determine the appropriate IBT entity to hear
IRB-recommended charges.

merger, which was January 1, 2004.  (Hahs Ex. B-1 at 8).

        Hahs' claim that, as a result of the merger with

the IBT, he has been unfairly held to a new standard of

conduct is baseless.  (Br. at 8).  As the IBT found,

> Neither Hahs nor any of the witnesses [who]
> testified on his behalf explained why they
> believed merging with the IBT and becoming
> subject to the Consent Decree somehow
> altered the fiduciary standards to which
> BLET officers are required to conform when
> dealing with the Union's money and other
> assets.  Nor did Hahs or his witnesses
> explain how enforcing these fiduciary
> standards against Hahs would impair the
> BLET's autonomy.

(Ex. L at 7).  Union money must be used for a union

purpose.  Morrisey v. Curran, 650 F.2d 1267, 1273-75 (2d

Cir. 1981); 29 U.S.C. §501(a).  As the IBT properly found,

"[t]he fiduciary standards that Union officers must satisfy

when dealing with Union funds and other assets are imposed

by federal law that applies to all labor organizations.

The Consent Decree did not change these standards beyond

providing additional procedures to enforce them."  (Ex. L

at 10).

        Hahs also claimed that the disciplinary action

against him, "[f]ailed to properly apply the BLET standards

and practices."  (Br. at 2).  This is inaccurate.  The IBT

hearing panel, which included a BLET member, heard

testimony from Hahs and others about the BLET's practices.

27

(Ex. K). As discussed above, the evidence supported the

IBT's finding that Hahs' actions were not consistent with

the BLET's past practices.

Hahs raises no basis for his contention that he

is not subject to the terms of the Consent Order. Hahs

identifies no provision of the IBT/BLET Merger Agreement

supporting the contention that he, as a BLET member, is

exempted from the Consent Order procedures. To the

contrary, the Merger Agreement, a copy of which is appended

to the IBT's November 3, 2008 response to Application 131,

provides that the "provisions of the IBT Constitution shall

apply on and after January 1, 2004." See Merger Agreement,

Section 6.6. The Consent Order is referenced on the very

first page of the IBT Constitution. See Government's

Response, Ex. A, at 1.[6] Moreover, there is no dispute in

the record that the disciplinary charges heard by the IBT

hearing panel concerned conduct after the January 1, 2004

merger of the IBT and BLET. See Application 131, Ex. A

(IRB-recommended charge). Indeed, Hahs acknowledged during

his testimony before the IBT hearing panel that he was

aware of the Consent Order. See Ex. K, at 466;

Ex. L, at 7.

---

[6] Excerpts of the IBT Constitution are appended hereto
as Exhibit A.

28

Hahs' argument that the IRB lacked authority to refer charges to IBT is also unavailing.  The Consent Order expressly grants the IRB authority to investigate corruption within the IBT and to recommend disciplinary charges to the IBT for further proceedings.  For these reasons, the terms of the Consent Order apply to Hahs, and he can demonstrate no procedural defect on this ground.

> 2.   Hahs Has Not Demonstrated Any
>       Procedural Defect in His
>       Disciplinary Proceedings That
>       Violates the LMRDA

Hahs has not demonstrated any procedural violation of the Labor Management Reporting and Disclosure Act ("LMRDA") based on the IBT's issuance of a disciplinary action to a BLET officer.

Section 101(5)(C) of the LMRDA "does not require that union disciplinary hearings incorporate the specific protections associated with judicial proceedings, including the right to be represented by counsel and the technical rules of pleading, procedure, and evidence." Frye v. United Steelworkers of Am., 767 F.2d 1216, 1224 (7th Cir.), cert. denied, 474 U.S. 1007 (1985), cited in United States v. IBT ("Kikes"), 88 Civ. 4486 (LAP), 2007 WL 2319129, at *4 (S.D.N.Y. Aug. 9, 2007).  A violation of a procedural

provision of a union constitution is only actionable if the
party was deprived of a full and fair hearing as a result.
See Carey and Hamilton, 247 F.3d at 385-86. "A court
considering a claim for relief under the LMRDA because a
party alleges that an internal union disciplinary hearing
violated the union's constitution must conduct a two-step
inquiry: (1) the court must find that the hearing violated
the constitution; and (2) it must find that the violation
deprived plaintiffs of a fair trial within the meaning of
the LMRDA." Yager v. Carey, 159 F.3d 638 (D.C. Cir. 1998),
aff'g 910 F. Supp. 704, 713 (D.D.C. 1995); see Gillen, 2008
WL at 2743695, at *5 (citing Yager, 159 F.3d at 638).
Accordingly, "courts should intervene in union disciplinary
actions under section 101(a)(5) only if there has been a
breach of fundamental fairness." See Kikes, 2007 WL
2319129, at *4; Carey and Hamilton Discipline, 22 F. Supp.
2d at 143.

Hahs has not established that the IBT's issuance
of discipline in this matter violated the LMRDA. Hahs has
not identified any violation of the IBT Constitution or the
BLET Bylaws that would satisfy the first prong of an LMDRA
violation. Indeed, to the extent that he argues that he,
as a BLET officer, could not be disciplined by the IBT, he
has failed to identify any provision of the BLET Bylaws

that support this contention. Hahs cites to Section 14(a)
of the BLET Bylaws, which states that the BLET's Advisory
Board has the authority "to suspend a national officer who
fails or refuses to perform the duties for which he was
elected or is at anytime guilty of any action calculated to
injure the organization in any way." See Hahs Objections,
at 9; Ex. 2, at 28 (BLET Bylaws, revised June 2006).
However, as Hahs concedes in his brief, Section 14(a) also
expressly references a hearing procedure conducted pursuant
to the IBT Constitution. Section 14(a) provides that a
BLET office may be suspended without pay "after having been
afforded a full and fair hearing in accordance with Article
XIX, Section 3 of the IBT Constitution..." See Hahs
Objections, at 9 (emphasis added); Ex. 2, at 28. Hahs has
not identified any provision of the BLET Bylaws prohibiting
the IBT from issuing sanctions following a disciplinary
decision and has not argued that the IBT violated any
provision of Article XIX of the IBT Constitution in issuing
the disciplinary decision. Accordingly, Hahs has failed to
establish any violation of the IBT Constitution or BLET
Bylaws.

Hahs also has not established a violation of
Section 4(d) of the IBT Constitution, which provides that
charges against elective officers of the IBT or any

31

subordinate body --

> [S]hall be limited only to those activities or
> actions occurring before their term of office,
> and only those activities and actions occurring
> prior to their current term which were not then
> known generally to the membership of the
> International Union or the subordinate body in
> the case of an officer of a subordinate body.

See IBT Constitution, Article XIX, Section 4(d)
(Government's Response, Ex. A). Hahs suggests in his
objections that because the issue of his expenses was known
and raised by a rival candidate during 2006 BLET
convention, he cannot be disciplined for the conduct now.
See Hahs Objections, at 6-7. However, as the IBT noted in
its decision in this case, although the BLET's purchase of
the Cleveland Cavalier tickets and payment for Janice Hahs'
travel expenses were raised during the 2006 BLET convention
in 2006, see Ex. L, at 7, Ex. 1, at 45-47, Ex. K, at 376-
77; Ex. 24, at 33-42, there is no indication in the record
that "those issues that were raised during the campaign
were more broadly known to the BLET membership at large[.]"
Ex. L, at 7. Perhaps more importantly, Section 4(d) does
not bar disciplinary charges against Hahs because he has

never admitted to the conduct for which he was charged, see
Ex. L, at 7-8, and indeed, denied any wrongdoing during his
IBT hearing, see Ex. K, at 470 ("There is not a question
that I did not embezzle money."). The Court of Appeals has
previously upheld disciplinary actions issued where
allegations of wrongdoing were known by the membership but
"vigorously denied" by the charged member. See Friedman
and Hughes, 905 F.2d at 620. Accordingly, Hahs has not
demonstrated any violation of the IBT Constitution in the
course of his disciplinary proceedings.

        Even if Hahs could establish a violation of the
IBT Constitution or BLET Bylaws, he cannot establish the
second prong of an LMRDA violation, which requires a member
to establish that a "breach of fundamental fairness"
occurred during his disciplinary proceedings. As noted
above, Hahs was provided with advance notice of the hearing
date, written notice of the charges against him, and
documentary evidence supporting the charge. See Exs. A, G;
see also Carey & Hamilton Discipline, 22 F. Supp. 2d at
143. At the panel hearing, Hahs was represented by counsel
and presented witnesses and evidence in his defense. See
Ex. K; Carey & Hamilton Discipline, 22 F. Supp. 2d at 143.
He therefore cannot demonstrate that his disciplinary
proceedings violated the LMRDA.

C.   The Sanction Imposed Upon Hahs Was Not Arbitrary
     or Capricious

Finally, the sanction imposed upon Hahs as a
result of the IRB charge was not arbitrary and capricious.
Hahs does not appear to challenge his removal from BLET
office and employment until 2010 and his one-year
suspension from membership; rather he focuses his
objections on the $44,963.67 fine issued by the IBT.   See
Hahs Objections, at 2.   The fine represented the net
expenditure by the BLET for the Cleveland Cavalier tickets
and the travel expenses of Janice Hahs.   See Ex. L, at 14-
15.   Although the IRB's proposed charge estimated that Hahs
had caused the BLET to spend $58,000 for non-union
purposes, see Ex. A, at 41-42,[7] the IBT issued a fine in the
amount of $44,963.67, which reflected a reduction for
amounts already repaid by Hahs to the BLET, see Ex. L, at
14-15.   For the following reasons, the IRB was within its
discretion to affirm the IBT's issuance of a fine to Hahs.

It is well settled that a "district court reviews
penalties imposed by the IBT in accordance with the Consent
Decree under an 'arbitrary and capricious' standard."
Boggia, 167 F.3d at 120; Gillen, 2005 WL 2743695, at *10.

---

[7] Exhibits 8-9, 66, 67, and 68 reflect an itemized
accounting of the amounts spent by the BLET on the
Cleveland Cavalier tickets, the travel expenses of Janice
Hahs, and other personal expenses of Hahs.

34

In reviewing IRB sanctions, this Court asks only whether

the sanction imposed represents an "allowable judgment" in

the choice of the remedy. United States v. IBT ("Wilson,

Dickens, Weber"), 978 F.2d 68, 73 (2d Cir. 1992) (citation

omitted). "[T]he reviewing court should not overturn the

. . . choice of sanctions unless it finds the penalty

unwarranted in law or without justification in fact."

Simpson, 120 F.3d at 348 (citing Wilson, Dickens, Weber,

978 F.2d at 73); see also United States v. IBT ("Bane"),

No. 88 Civ. 4486 (LAP), 2002 WL 654128, at *16 (S.D.N.Y.

2002) ("The relevant inquiry with respect to an IRB

sanction is not whether the Court agrees or disagrees with

it but rather is limited to whether the IRB made an

allowable judgment in its choice of remedy.") (citation

omitted), aff'd, 59 Fed. Appx. 424 (2d Cir. Mar. 13, 2003).

          The fine imposed on Hahs is an allowable judgment

because the IBT Constitution specifically provides for the

imposition of fines. See IBT Constitution, Article XIX,

Section 10(a) (Government's Response, Ex. A).

Section 10(a) provides that decisions and penalties imposed

on IBT members and officers "may consist of reprimands,

fines, suspensions, expulsions, revocations, denial to hold

any officer permanently or for a fixed period, or commands

to do or perform, or refrain from doing or performing,

specified acts." See id. Moreover, the Court of Appeals has acknowledged the appropriateness of fines in the union disciplinary context. See United States v. IBT (Giacumbo), 170 F.3d 136, 144-45 (2d Cir. 1999) (IRB proposed sanction of suspension and fine not "arbitrary or capricious," and remanding for IRB to consider sanctions in light of subsequent misconduct); United States v. Local 39, United Seafood Workers, 55 F.3d 64, 68 (2d Cir. 1995) (affirming fines issued in disciplinary proceedings pursuant to consent judgment).

The $44,963.97 fine imposed by the IBT was not arbitrary or capricious in that it represented the total amount of the Cleveland Cavalier tickets and Hahs' wife's travel expenses where the evidence showed no segregable aspect of the expenditure that was union-related. For instance, Hahs argues that the IBT erroneously fined him for the entire price of the tickets because others used the tickets, see Hahs Objections, at 12-13, but he conceded during his April 12, 2007 deposition that he kept no records relating to the use of the tickets and therefore could not identify any particular tickets that were used by current or prospective tenants in the building. See Ex. 1, at 72-74, 83. Accordingly, the IBT's issuance of a fine for the entire amount of the tickets, subtracting amounts

36

that Hahs had already refunded, was not arbitrary or
capricious. See Ex. L, at 14-15.

Hahs' argument the IBT's imposition of a fine for
his wife's travel expenses ignored the "BLET's long
traditions and practices" regarding the "leadership
provided, directly and indirectly, by the wives of the
principal officers of the International Union" is also
unavailing. See Hahs Objections, at 15-16. The IBT
properly found that although it "cannot say that an
expenditure of union funds for travel by a union official's
spouse will invariably be considered in improper," the
record in this case did not support Hahs' contention that a
union purpose was served by his wife's travel. See Ex. L,
at 12-13. As set forth supra, the record evidence showed
that Janice Hahs was not an employee of the BLET, see Ex.
1, at 41-42; Ex. L, at 9, or an officer of the BLET's Grand
International Auxiliary, see Ex. L, at 5, 9, 13. Moreover,
Hahs conceded in his deposition testimony and in his IBT
hearing that his wife did not have any documented
leadership role or other significant participation in the
union's affairs at the events she attended. See, e.g., Ex.
1, at 47-48 (no documentation of Janice Hahs' role in union
meetings), at 99, 114, 188-89, 258-59 (no reference to
Janice Hahs as "liaison" or her actions in support of

37

union); at 258-59 (no role in National Wage Rule Meeting).
The IBT rejected Hahs' contention that his wife's travel
expenses were justified because her attendance at social
events with him and the spouses of other members was
"expected."  Ex. L, at 12-13.  Because Hahs was unable to
substantiate Janice Hahs' role or contribution to the BLET
at the events and functions to which she traveled, the
IBT's imposition of a fine for these amounts was not
arbitrary or capricious.

## Conclusion

For the reasons set out above, Application 131 is
granted, and the IRB's determination affirmed in all
respects.

SO ORDERED:

Dated:  August 18, 2009

*Loretta A. Preska*

LORETTA A. PRESKA
Chief,
United States District Judge

IBT131