**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

United States of America,

*Plaintiff*,

-against-

International Brotherhood of Teamsters *et al.*,

*Defendants*.

------------------------------------------------------- x

Case No.: 88 Civ. 4486 (LAP)

**MEMORANDUM IN SUPPORT OF JOINT MOTION FOR MODIFICATION OF FINAL ORDER AND ENTRY OF REVISED FINAL ORDER**

NIXON PEABODY LLP
BRIAN T. KELLY
JOSHUA C. SHARP
53 State Street
Boston, MA 02109
(617) 345-1000
*Attorneys for the International Brotherhood of Teamsters*

JAY CLAYTON
United States Attorney for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007
(212) 637-2703

BENJAMIN H. TORRANCE
Assistant United States Attorney
-Of Counsel-

*Attorney for the United States*

The United States of America (the "Government") and the International Brotherhood of Teamsters ("IBT" or "Union") (collectively, the "Parties") respectfully submit this memorandum in support of their joint application for modification of the Final Order entered in this matter and approval of the proposed Revised Final Order (hereinafter "Revised Final Order"). The proposed Revised Final Order, as well as a redlined version of the Final Order reflecting the proposed changes, are attached respectively as Exhibits 1 and 2 to the Notice of Motion. The Parties agree that the Revised Final Order is fair, reasonable, consistent with the public interest, and properly allows the IBT to function as a self-governing organization without unnecessary government oversight. Accordingly, the Parties respectfully urge the Court to enter the proposed Revised Final Order.

## BACKGROUND

### The Consent Decree

On June 28, 1988, the Government commenced this action seeking relief against the IBT, its General Executive Board, various IBT officers, the "Commission" of La Cosa Nostra, and various asserted members and associates of La Cosa Nostra. The Government sought civil remedies under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1964. Among other things, the Government's complaint alleged that the La Cosa Nostra defendants, aided by IBT defendants, had seized "an interest in and control of" the Union to implement an extensive "pattern of racketeering activity" that included mail fraud, embezzlement, bribery, and murder. Compl. ¶ 55. The claimed pattern of racketeering encompassed the "use of force, violence and fear to intimidate union members," Compl. ¶¶ 72-73, and systematic racketeering activities by which corrupt union officers engaged in "fraudulent deprivation of union members' money and property rights," Compl. ¶¶ 74-80.

On March 14, 1989, this Court approved a consent order that resolved the Government's claims against the IBT defendants (the "Consent Decree"). The Consent Decree enjoined certain activity and instituted institutional reforms of the IBT's disciplinary and electoral processes. Among other features, the Consent Decree:

- Permanently enjoined all IBT members, officers, employees, and agents from committing acts of racketeering activity and knowingly associating with various organized crime groups or persons otherwise enjoined from participating in union affairs;
- Provided for "one-member, one-vote" direct elections of IBT International Officers, subject to independent oversight, whereby IBT locals' rank-and-file members would elect delegates to a nominating convention, convention delegates would nominate candidates, and IBT rank-and-file members would then vote in a general election on all nominees who received 5% or more of the delegates' votes;
- Established the Court-appointed, three-member Independent Review Board ("IRB") as a permanent part of the Union's constitution to investigate and prosecute wrongdoing and oversee the IBT's implementation of disciplinary or trusteeship charges.

The Consent Decree was subsequently clarified and modified by agreement of the Parties and by Court order.

**The Final Order**

In January 2015, the Government and the IBT filed a joint motion seeking approval of a proposed Final Order to supersede the Consent Decree. As noted at that time, the Government and the IBT agreed that the organized crime influence that the Government found to have reached the highest echelons of IBT leadership in 1988 had long been expunged, and the number and gravity of disciplinary offenses within the Union had substantially diminished over time. The parties

further informed the Court that the electoral system which had once impeded members from holding to account their leaders had been overhauled and replaced with a system of one-member, one-vote democratic governance. *See* Dkt. No. 4410 at 2-3. The Final Order, which the Court entered on February 17, 2015, provided as follows:

- *Permanent Injunctions*. The Final Order retained all permanent injunctions set forth in the Consent Decree, including, but not limited to, permanently enjoining all IBT members, officers, employees, and agents from committing acts of racketeering activity and knowingly associating with various organized crime groups or persons otherwise enjoined from participating in union affairs.
- *Structural Electoral Reform*. The Final Order required the IBT to permanently retain the "one-member, one-vote" direct elections of IBT International Officers which were adopted by the IBT at the 2001 IBT Convention, as well as certain other structural electoral reforms implemented by the Consent Decree and enshrined in the 2011 IBT Constitution. For the 2016 and 2021 IBT International Officer elections, the IBT was to maintain a maximum nomination threshold of 5%, whereby nominees with 5% of delegate votes qualify as general election candidates. After the 2021 election, the IBT's democratically elected delegates or membership could change the nomination threshold, subject to the Government's right to apply to the Court to nullify any such change. All elections were to be conducted pursuant to Election Rules to ensure fair, free, and democratic elections.
- *Independent Election Supervision*. All elections were to be supervised by an Independent Election Supervisor appointed by the IBT, with the IBT bearing the costs of independent

supervision. The authority to interpret and enforce the Election Rules was at all times with the Independent Election Supervisor.

- *Union Discipline*. The Final Order required the IBT to establish an effective and independent disciplinary enforcement mechanism, comprising one Independent Investigations Officer (the "IIO") and one Independent Review Officer (the "IRO," and collectively with the IIO, the "Independent Disciplinary Officers"), with ultimate authority to discipline IBT members and require compliance with the IBT Constitution and rules. The Independent Disciplinary Officers were granted broad powers, including the right to exercise such investigative and disciplinary authority as previously exercised by the IRB, as well as the authority that the General President, General Secretary-Treasurer, and General Executive Board were authorized and empowered to exercise pursuant to the IBT Constitution.

**The Proposed Revised Final Order**

The primary proposed revisions to the Final Order involve the provisions relating to union discipline. Over the last four years, the IBT has devoted substantial resources to develop and enhance its internal investigative, disciplinary, and audit systems. Earlier this year, the IRO, the Honorable Barbara S. Jones of the firm Bracewell LLP, conducted an assessment of the IBT's internal disciplinary systems and audit functions. This assessment included numerous interviews of IBT leadership and personnel as well as the review of a substantial volume of policies, procedures, data, disciplinary files, training materials, and other documents. The IRO concluded that the IBT has "developed the institutional tools, processes, and procedures necessary to adequately detect, investigate, and resolve instances of major corruption" within the Union, and that the Union has "sufficient institutional capacity to assume responsibility of internal

investigations and compliance functions currently performed by the IIO." In addition to making these findings, the IRO issued a written set of recommendations to enhance the IBT's internal disciplinary systems and audit functions, which the Union has agreed to implement working with the IRO.

The proposed Revised Final Order requires the IBT to continue to maintain rigorous internal investigative, disciplinary, and audit systems to effectively identify, address, and eliminate the influence of organized crime and all forms of major corruption within the Union. *See* proposed Revised Final Order ¶ 19. Under the proposed Revised Final Order, the IBT is required to maintain its Office of Compliance Standards and Investigations ("OCSI") as well as its internal and affiliate audit departments as permanent components of its compliance infrastructure and must provide them with adequate resources and staffing. *Id.*

The major changes to the Final Order are the elimination of the IIO position on December 31, 2026,[1] and the anticipated sunsetting of the IRO position three years after entry of the Revised Final Order. *Id.* ¶¶ 20, 24. The Parties respectfully submit that the ultimate elimination of these roles is appropriate given the progress the Union has demonstrated in developing internal investigative and disciplinary capabilities. During the three years the IRO remains in place, she will continue to have the authority to review certain IBT disciplinary decisions, including those stemming from organized crime, labor racketeering, corrupt relationships with employers or third-parties, election fraud, and theft or embezzlement of over $100,000. *Id.* ¶ 27. To the extent the IRO conducts

[1] The proposed Revised Final Order provides a framework for winding down the IIO's work over the next several months. The IIO and his staff will make best efforts to complete the majority of the IIO's pending investigations, and issue written investigative reports detailing proposed charges and recommendations when appropriate, by the end of the year. *Id.* ¶ 20. In addition, the IIO may refer pending investigations to the IRO for a determination as to whether the investigation should be transferred to the OCSI or referred to an appropriate law enforcement agency for appropriate resolution. *Id.* ¶ 21. All new complaints received by the IIO after entry of the Revised Final Order will be referred to the OCSI for intake, investigation, and disposition. *Id.* ¶ 22.

hearings and issues written decisions on any matter, such decisions shall continue to be binding and final and not subject to any further review. *Id.* ¶ 30. In addition, pursuant to the proposed Revised Final Order, the IRO will be authorized to periodically review the OCSI's practices and investigations as well as the Union's internal and affiliate audit functions, and may issue recommendations to ensure the continued effectiveness of the IBT's compliance, audit, and investigative functions. *Id.* ¶¶ 35-36. The IBT is required to work cooperatively with the IRO to implement those recommendations. *Id.* The IRO's review and oversight role during this three-year period should ensure a smooth transition to a fully internal disciplinary structure.

At the conclusion of this three-year period, the IRO will advise the Court in writing that her term has ended. *Id.* ¶ 38. If the IRO believes there is good cause for extending her term, she will notify the Court at least two months prior to the expiration of her term. *Id.* After the IRO position sunsets, the IBT will retain an Independent Compliance Professional to ensure that the Union's internal investigative, disciplinary, and audit functions continue to operate effectively. *Id.* ¶¶ 40-44. The Independent Compliance Professional will serve as a permanent member of the IBT's Audit Committee, will be appointed to a three-year term, and cannot be removed absent good cause and by a vote of 75% of the IBT's General Executive Board. *Id.*

Certain other key aspects of the proposed Revised Final Order include:

- *Permanent Injunctions*. The Revised Final Order retains all permanent injunctions set forth in the Final Order (which, in turn, retained the permanent injunctions of the Consent Decree). *Id.* ¶ 1.

- *Independent Election Supervision*. The Revised Final Order retains the role of the Independent Election Supervisor, who is currently the Honorable Timothy Hillman, formerly of the United States District Court for the District of Massachusetts. As in the

Final Order, the authority to interpret and enforce the Election Rules will rest at all times exclusively with the Independent Election Supervisor. *Id.* ¶¶ 7-18. There will be no appeal above the Independent Election Supervisor, other than as consistent with relevant law. *Id.*

- *Structural Electoral Reform*. The Revised Final Order retains the structural electoral reforms of the Consent Decree, including the one-Teamster, one-vote direct elections of IBT International Officers. *Id.* The 5% nomination threshold for International Officers and Trustees will be maintained through at least the 2026 Convention, after which point it may be increased to up 8% subject to approval by the Independent Election Supervisor. *Id.* ¶ 8. As with the Final Order, elections shall be conducted pursuant to rules and procedures designed to ensure a fair, free, and democratic election. *Id.* ¶ 12.

Overall, the proposed revisions to the Final Order are designed to further reduce the involvement of the Government and the Court in the IBT's internal affairs, which is appropriate given the progress the Union has made toward achieving the underlying goals of the Consent Decree.[2]

## ARGUMENT

To quote this Court's 2015 Order approving modification of the Consent Decree and implementation of the Final Order, "It is well settled that there is a 'strong judicial policy in favor of settlements,' especially where 'a government agency committed to the protection of the public interest has participated in and endorsed the agreement.'" Dkt. 4414 (Feb. 17, 2015 Order)

[2] The proposed Revised Final Order removes references to the "Transition Period," which ended several years ago so those references are no longer applicable. It also eliminates certain requirements related to notices that that the Union had needed to provide to the Government.

(quoting *McReynolds v. Richards-Vantave*, 588 F.3d 790, 803 (2d Cir. 2009), and *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 692 (S.D.N.Y. 1988)).

In *S.E.C. v. Citigroup Global Markets, Inc.*, 752 F.3d 285 (2d Cir. 2014), the Second Circuit clarified the standard for approval of settlements containing ongoing injunctive provisions. The *Citigroup* test establishes a highly deferential approach, stating that the district court should determine whether the settlement is "fair and reasonable, with the additional requirement that the 'public interest would not be disserved.'" *Id*. at 294 (quoting *eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)). "Absent a substantial basis in the record" for concluding that these elements are not satisfied, "the district court is required to enter the order." *Id*. There are four core factors that are relevant to the Court's assessment of whether the proposed Revised Final Order is fair and reasonable: (1) its "basic legality"; (2) whether its terms, "including its enforcement mechanism, are clear"; (3) whether it reflects a resolution of the actual claims in the complaint; and (4) whether it "is tainted by improper collusion or corruption of some kind." *Id*. at 294-95 (citations omitted).

These factors are satisfied here. First, the Court has the authority to enter the proposed Revised Final Order pursuant to any or all of the following: its inherent power; Federal Rule of Civil Procedure 60(b); and 18 U.S.C. § 1964. *Citigroup*, 752 F.3d at 294. Courts possess broad equitable powers to modify consent decrees. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 n.6 (1992) ("[T]he power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible.") (*quoting New York State Assn. for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983)); *see Brown v. Plata*, 563 U.S. 493, 542 (2011) (court "retains the authority, and the responsibility, to make further amendments to [an] existing order or any modified decree it may enter as warranted by the exercise of its sound discretion"). Second, the terms of the Parties' agreement and its enforcement mechanism are clear. *See Citigroup*, 752

F.3d at 295; *see also United States v. IBM Corp.*, 14 Civ. 936 (KMK), 2014 WL 3057960, at *3 (S.D.N.Y. July 7, 2014) ("By 'clear,' the Second Circuit appears to mean that the decree 'properly defines' its key provisions." (brackets omitted)), *order clarified*, 2014 WL 4626010 (Aug. 7, 2014). The proposed Revised Final Order specifically sets forth the terms of the ongoing injunctive relief and the roles of the Independent Election Supervisor and the IRO going forward, among other things. Third, the proposed Revised Final Order reflects a resolution of the claims in this lawsuit. *See Citigroup*, 752 F.3d at 295. Indeed, by agreeing to the Revised Final Order, the Parties seek to maintain the improvements to the Union's disciplinary and electoral processes and ensure that the Union maintains and enhances effective internal investigative, disciplinary, and audit functions to address the influence of organized crime and corruption, which prompted the Government's lawsuit. Fourth, the proposed Revised Final Order has not been "tainted" in any sense by collusion or corruption. Indeed, the terms are a product of extensive negotiations between the Parties, and reflect the input of the IRO and the Independent Election Supervisor.

As this Court noted approving modification of the Consent Decree and implementation of the Final Order:

> Ultimately, "[t]he job of determining whether the proposed . . . consent decree best serves the public interest . . . rests squarely with" the litigating agency. This is because the decision of whether or not to enter a consent decree is "primarily about pragmatism," and involves assessments of risk "that are uniquely for the litigants to make." An agency's determination that settlement is appropriate "merits significant deference," and accordingly, the '"primary focus of the [Court's inquiry . . . should be on ensuring the consent decree is procedurally proper."
>
> …
>
> [T]he policy choices embodied in the agreement that [are] the product of good faith bargaining between the parties [are] decisions that lie outside of the ambit of this Court's review. The Court may not substitute its own judgment for that of the United States Attorney's Office because "[t]he responsibilities for assessing the wisdom of such policy

> choices and resolving the struggle between competing view of the public interest are not judicial ones."

Dkt. 4414 at 3 (Feb. 17, 2015 Order) (*quoting Citigroup*, 752 F.3d at 295-96).

Although this standard is highly deferential, the Parties offer the following observations with respect to the Revised Final Order. The Consent Decree was originally necessary because of the influence of organized crime within the Union. The Consent Decree achieved its objectives of ridding the union of widespread corruption and organized crime. Since the entry of the Consent Decree and the subsequent Final Order, the IBT has made significant and substantial progress toward eliminating corruption from within the IBT and in conducting free, open, and democratic elections for International Officers and Convention Delegates. The IBT has demonstrated its ability to conduct effective internal investigations and audits. It is appropriate at this point to eliminate the IIO role and further reduce the Government's and Court' s role in the IBT's disciplinary and electoral functions, as set forth in the proposed Revised Final Order.

**CONCLUSION**

For the foregoing reasons, the Government and the IBT respectfully request that the Court approve and enter the Revised Final Order.

Dated: New York, New York
June 17, 2026

**FOR PLAINTIFF UNITED STATES OF AMERICA**

JAY CLAYTON
United States Attorney for the
Southern District of New York

By: /s/ Benjamin H. Torrance

Benjamin H. Torrance
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
212.637.2703
benjamin.torrance@usdoj.gov

**FOR DEFENDANT INTERNATIONAL BROTHERHOOD OF TEAMSTERS**

/s/ Brian T. Kelly

NIXON PEABODY LLP
Brian T. Kelly (admission pro hac vice pending)
Joshua C. Sharp (admitted pro hac vice)
53 State Street
Boston, Massachusetts 02109
617.345.1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com